**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-CR-367** |
| | : | |
| **MARK MIDDLETON &** | : | |
| **JALISE MIDDLETON** | : | |
| | : | |
| **Defendants.** | | |

**UNITED STATES' MOTION IN LIMINE TO PRECLUDE**
**<u>IMPROPER DEFENSE ARGUMENTS AND EVIDENCE</u>**

The United States of America moves in limine, pursuant to Fed. R. Evid. 401, 403, and

611(b), to preclude the defendants from introducing evidence or making arguments:

(1) On the specific location of security cameras in the U.S. Capitol;

(2) On specific Secret Service tactics and emergency operations;

(3) That their conduct was authorized by former President Trump or other officers or

officials;

(4) That any inaction by law enforcement permitted their conduct;

(5) That the First Amendment permitted their conduct;

(6) On any matter that encourages jury nullification;

(7) That they defended themselves or others on January 6, 2021; and

(8) On their prior good acts or relative culpability to other actors on January 6, 2021.

## I. LEGAL BACKGROUND

It is well-established that a district court has the discretion to limit a criminal defendant's

presentation of evidence and cross-examination of witnesses. *See Alford v. United States,* 282 U.S.

687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject

of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d

609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See e.g., United States v. Balistreri,* 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds* by *Fowler v. Butts,* 829 F.3d 788 (7th Cir. 2016). Other permissible reasons for limiting cross-examination include preventing harassment, prejudice, confusion of the issues, or repetitive, cumulative, or marginally relevant questioning. *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

While limiting the defendant's opportunity for cross-examination may implicate the constitutional right to confront witnesses, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until a defendant sufficiently establishes that defense through affirmative evidence presented during his or her own case-in-chief. *See United States v. Lin,* 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol,* 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief); *United States v. Stamp,* 458 F.2d 759, 773 (D.C. Cir. 1971) (finding trial court properly excluded cross

2

examination of government's witness with response to matter only related to an affirmative defense and not elicited through direct exam). Preventing the defendants from exploring the topics above will not infringe their Confrontation Clause right because, as shortly explained, such topics have little probative value, and the defendants have more direct ways of making their case.

## II.   ARGUMENT

### A.   This Court Should Preclude The Defendants From Seeking Testimony On The Location of Specific Surveillance Cameras

The United States asks the Court to restrict the defendants' presentation of evidence regarding the specific position of U.S. Capitol Police surveillance cameras. To meet its burden of proof at trial, the government will present video evidence from a variety of sources, including Capitol Police surveillance footage. As detailed in the Declaration of Thomas A. DiBiase (Exhibit 1), the Capitol Police maintains an extensive closed-circuit video system which includes cameras inside the Capitol Building, inside other buildings within the Capitol complex, and outside on Capitol grounds. These cameras captured thousands of hours of footage from the breach of the Capitol and have been instrumental in documenting the events of January 6, 2021.

However, the U.S. Capitol Police's surveillance system also serves an important, and ongoing, function in protecting Congress and, by extension, national security. In particular, the footage from the system is subject to limitations and controls on access and dissemination. *See* Exhibit 1. To find relevant footage from the Capitol Police's surveillance system and adequately prepare for trial, one would need to use maps which display the locations of the interior and exterior cameras. The government has therefore provided the defense with maps that display these locations. However, due to the sensitive nature of these items, the government seeks an order limiting the defense from probing, during cross-examination, the exact locations of Capitol Police

surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial.[1]

> **1.    The Defendants Should Be Precluded From Questioning Witnesses About The Exact Positions Of Capitol Police Cameras, Introducing Such Evidence Themselves, Or Admitting Capitol Police Maps Of Camera Coverage**

Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded in light of the ongoing security needs of the Capitol. The defense can probe what Capitol Police's cameras show, and what they don't, by asking about the general location of each camera. For example, a camera positioned inside the Lower West Terrace tunnel can be described as "inside the tunnel, facing out" without describing its exact height and depth within the tunnel and without showing a picture of the camera. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. A general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not. Additionally, presenting the map of all Capitol Police cameras would risk compromising these security concerns for no additional probative value: the map contains numerous cameras installed in parts of the Capitol that the defendants did not visit.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger to national security. *See United States v. Mohammed,* 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005) (finding that information having broader national security concerns can be excluded under Rule 403 because its tendency to confuse the issues, mislead the jury, create side issues or a mini-trial and can result in undue prejudice that substantially outweighs

---

[1] These maps have been disclosed to the defendants but, pursuant to the terms of the protective order, have been designated Highly Sensitive. Moreover, these maps have been designated as "Security Information" under 2 U.S.C. §1979 which forbids their use without the approval of the Capitol Police Board.

any probative value). If the map of the Capitol cameras is introduced in this trial, or in any trial, it becomes available to the public. Immediately, anyone could learn about the Capitol Police's camera coverage as of January 6, 2021, and—importantly—could learn about the parts of the Capitol where cameras were not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*

<blockquote>

2.      **The Government Requests An *In Camera* Proceeding To Determine The Admissibility Of Certain Evidence**
</blockquote>

If the defense believes that presentation of the exact locations of the Capitol Police cameras is necessary, or that presentation of the Capitol Police map is necessary, the government requests that the Court conduct a hearing in camera to resolve the issue. As noted, in this case, disclosure of certain information could prove detrimental to the Capitol Police's ability to protect members of Congress and could affect our national security. Courts have found such considerations justify ex parte, in camera proceedings. *See United States v. Nixon,* 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles,* 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that in camera . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor,* 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that in camera proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security."); *United States v. Brown,* 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) (same). At any such hearing, the defendant should be required to make "a proffer of great specificity" regarding the need for the evidence and the scope of his questions. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (requiring such proffer where evidence of defendant's belief might have permissible and

impermissible purposes, and careless admission would raise issues under Fed. R. Evid. 403). As such, an in camera proceeding is appropriate, if the defense believes that presentation of the exact locations of the Capitol Police, or the Capitol Police map itself, is necessary.

**B.      This Court Should Preclude Testimony On Specific Secret Service Tactics And Emergency Operations**

The United States asks the Court to limit the defendants' cross examination of Secret Service witnesses on their specific tactics and emergency operations. Among other violations, the defendants are charged with violating 18 U.S.C. § 1752(a)(1) and (2) by knowingly entering or remaining in a restricted building or grounds without lawful authority. That statute defines "restricted buildings or grounds" to include any building or grounds temporarily visited by a person being protected by the Secret Service. 18 U.S.C. § 1752(c)(1)(B). To meet its burden of proof at trial, the government will call a witness from the United States Secret Service to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and two of his immediate family members, all of whom were present at the Capitol. This official will further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members.

However, the very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security. Thus, the government seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the function performed by the Secret Service as testified to on direct exam, in this case protecting the Vice President and his family. The defendants should be specifically foreclosed from questioning the witnesses about the following:

1.  Secret Service protocols related to the locations where protectees or their motorcades

are taken at the Capitol or other government buildings when emergencies occur; and

2. Details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees.

Cross-examination of Secret Service witnesses about these extraneous matters beyond the scope of direct examination should be excluded as irrelevant or unduly prejudicial. The Secret Service's general protocols about relocation for safety, for instance, should be excluded as irrelevant because such evidence does not tend to make a fact of consequence more or less probable. Fed. R. Evid. 401 (defining relevant evidence). Similarly, evidence of the nature of Secret Service protective details is not relevant in this case. The number or type of assigned agents on a protective detail does not alter the probability that the Capitol and its grounds were restricted at the time. None of the other elements to be proven, or available defenses, implicates further testimony from the Secret Service.

As discussed above, even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, mini-trials, undue delay, and waste of time. Broader cross-examination of Secret Service witnesses could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses.

Finally, if this Court determines that a hearing is necessary to determine the admissibility of testimony by a witness from the Secret Service, the government requests the hearing be conducted *in camera* and *ex parte*. As noted, in this case, disclosure of certain information could prove detrimental to the Secret Service's ability to protect high-level government officials and affect our national security. Courts have found such considerations justify ex parte, in camera proceedings, and as necessary should do so here.

### C.   This Court Should Preclude the Defendants From Arguing Entrapment By Estoppel Or Making A Public Authorities Defense

The United States asks the Court to prohibit the defendants from making arguments or introducing irrelevant evidence that former President Trump or other officials gave the defendants permission to attack the U.S. Capitol, in what are commonly known as "entrapment-by-estoppel" or "public authority" defenses.

Entrapment-by-estoppel and public authority defenses are closely related and derive from a constitutional prohibition against "convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837, at *7 (D.D.C. Dec. 28, 2022) (J. Bates) (quoting *Cox v. Louisiana*, 379 U.S. 559, 571 (1965)). Both defenses are narrow ones, however, and a defendant may succeed on them only if he meets rigorous evidentiary requirements. *See United States v. Alvarado*, 808 F.3d 474, 484-85 (11th Cir. 2015) ("The public authority defense is narrowly defined, however, and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Baker*, 438 F.3d 749, 755 (7th Cir. 2006) ("The [entrapment-by-estoppel] defense is a narrow one."). In particular, to succeed on an entrapment-by-estoppel claim, a defendant must prove:

> (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (C.J. Howell) (quoting *Cox*, 906 F.3d at 1191). This district has articulated a similar four-part analysis for the public authority defense:

> [A]n individual (1) reasonably, on the basis of an objective standard, (2) relies on

a (3) conclusion or statement of law (4) issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.

*Sheppard*, 2022 WL 17978837 at *8 (quoting *United States v. Barker*, 546 F.2d 940, 955 (D.C. Cir. 1976). Common between these standards is, among other things, that a government official must offer a "state" or "statement" of the law.

The defendants have not, and cannot, argue that, in urging his supporters towards the Capitol, then-President Trump made a "statement" of law. By now, several courts in this district have considered various defendants' arguments that the President's words immunized their actions on January 6. To the government's knowledge, all these arguments have failed. *See Sheppard*, 2022 WL 17978837 at *9 (prohibiting defendant from seeking discovery or presenting evidence at trial on entrapment-by-estoppel or public authority defenses); Order at 2, ECF No. 39, *United States v. Thompson*, No. 21-cr-161 (D.D.C. Mar. 23, 2022) (J. Walton) (excluding evidence of former President Trump's statements for all purposes as unduly prejudicial under Fed. R. Evid. 403); *United States v. Grider*, No. 21-cr-022, 2022 WL 3030974, at *4 (D.D.C. Aug. 1, 2022) (J. Kollar-Kotelly) (declining to instruct jury on defense of entrapment by estoppel); *Chrestman*, 525 F.Supp.3d at 33 (noting that an entrapment-by-estoppel defense is "highly unlikely" to succeed and declining to consider it as weighing in favor of granting pre-trial release).

Defendants' efforts to assert an entrapment-by-estoppel defense have uniformly failed, given that, as Judge Bates observed, the defense is available "only when the official's statements or conduct state or clearly imply that the defendant's actions are lawful." *Sheppard*, 2022 WL 17978837 at *9. The key challenge for the defendants is that, as Courts have observed, "President Trump neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful." *Id.* Rather:

[Trump's] speech simply suggests that it would be an act of "boldness" to "stop the

> steal." Thus, allowing [the defendant's] reliance on these words would be an
> instance of allowing "following orders, without more, [to] transform an illegal act
> into a legal one"—something the D.C. Circuit has unequivocally declined to do.

*Id.* (quoting *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990)).

Similarly, Judge Kollar-Kotelly, in considering an entrapment-by-estoppel argument, noted that "former President Trump's statements did not in any way address the legality of the actions he urged his supporters to take. He did not, for example, assure them that marching along Pennsylvania was 'lawful' or that occupying Capitol grounds was 'permissible.'" *Grider*, 2022 WL 3030974 at *3. In short, then-President Trump did not "actively misle[a]d [the defendant] about the state of the law," because Trump did not make any statement about the law at all. *Id.* at 2 (quoting *Chrestman*, 525 F.Supp.3d at 14).

Yet, even if then-President Trump had made a statement about the law, allowing those statements to immunize the defendants' conduct would raise serious constitutional concerns. As Judge Howell observed about another entrapment-by-estoppel defense by a similarly situated defendant, "No American President holds the power to sanction unlawful actions because this would make a farce of the rule of law." *Chrestman*, 525 F.Supp.3d at 32:

> [N]o President may unilaterally abrogate criminal laws duly enacted by Congress
> as they apply to a subgroup of his most vehement supporters. Accepting that
> premise, even for the limited purpose of immunizing defendant and others similarly
> situated from criminal liability, would require this Court to accept that the President
> may prospectively shield whomever he pleases from prosecution simply by
> advising them that their conduct is lawful, in dereliction of his constitutional
> obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, §
> 3. That proposition is beyond the constitutional pale, and thus beyond the lawful
> powers of the President.
>
> Even more troubling than the implication that the President can waive statutory law
> is the suggestion that the President can sanction conduct that strikes at the very
> heart of the Constitution and thus immunize from criminal liability those who seek
> to destabilize or even topple the constitutional order. In addition to his obligation
> to faithfully execute the laws of the United States, including the Constitution, the

> President takes an oath to "preserve, protect and defend the Constitution." U.S. Const. art. II, § 1, cl. 8. He cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution.

*Id.* at 32–33 (D.D.C. 2021). In other words, to allow an entrapment-by-estoppel or public authority defense based on the President's false statements of law would implicate both the Take Care clause and the presidential oath of office, and more fundamentally question the nature of the rule of law in America.

Although *Chrestman* involved an argument that former President Trump gave the defendants permission to enter the Capitol grounds, the reasoning in *Chrestman* applies equally to any argument that other officials or law enforcement officers gave permission to the defendants to do the same. Just as a President cannot unilaterally repeal laws, no other officials or members of law enforcement could use their authority to allow individuals to enter the Capitol building during a violent riot. As Judge Howell observed, "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377, at *2 (D.D.C. June 8, 2022).

Even if the defendants in this case could establish that an official or officer told them that it was lawful to enter the Capitol grounds or allowed him to do so, the defendants' reliance on any such statement would not be reasonable considering the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F.Supp.3d at 32. Moreover, the defendants' actions here contradict any argument that they relied on any such statement by law enforcement when they decided to unlawfully enter the Capitol grounds. The defendants should be prohibited from arguing that their conduct was lawful because someone allegedly told them it was.

### D. This Court Should Preclude The Defendants From Arguing That Alleged Inaction By Law Enforcement Officers Made Their Conduct On January 6, 2021 Legal

In addition to prohibiting arguments that any officials or officers permitted the defendants to enter the Capitol grounds, the Court should bar the defendants from arguing that any failure of law enforcement to act rendered the defendants' conduct legal. The same reasoning that applied in *Chrestman* again applies here. That is, like the President, a law enforcement officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction. *Chrestman*, 525 F.Supp.3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law, nor can an officer ratify unlawful conduct by failing to prevent it.

"Settled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, No. 21-cr-377 at *3; s*ee also Garcia v. Does*, 779 F.3d 84, 95 (2d Cir. 2015) (en banc) (entrapment-by-estoppel defense rejected after defendants argued that their prosecuted conduct had been implicitly approved by the police but could not show that it was "affirmatively authorized" by the police). The same principles apply here. The defendants should be prohibited from arguing that their conduct was lawful because law enforcement officers allegedly failed to prevent it or censure it when it occurred.

### E. This Court Should Preclude The Defendants From Arguing That Their Conduct Was Protected By The First Amendment

To avoid confusing the issues or misleading the jury, the Court should (1) permit the government to use otherwise-protected speech (such as political speech) as evidence in this trial, and (2) preclude the defendants from arguing that their conduct on January 6 was protected by the First Amendment.

1. <u>The government should be permitted to introduce the Defendants' statements as evidence of corrupt intent.</u>

The statements that the defendants made about their beliefs surrounding the 2020 Presidential Election and the certification thereof are admissible intent evidence. It is uncontroversial that a defendant's statements, which would otherwise be protected under the First Amendment, may be introduce in a criminal case when those statements are evidence of the intent behind a defendant's acts. *See Wisconsin v. Mitchell*, 508 U.S. 476 (1993). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trial subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id*. at 489. Courts across the country have followed the mandate in *Mitchell* and admitted evidence for this purpose. *United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (admitting musical lyrics composed by a defendant in a Hobbs Act prosecution); *United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015) ("The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [defendant's] participation in, the alleged RICO enterprise[.]" (internal citations omitted); *United States v. Salameh*, 152 F.3d 188, 111-112 (2d Cir. 1998)  (the defendants were not "prosecuted for possessing or reading terrorist materials. The materials seized […] were used appropriately to prove the existence of the bombing conspiracy and its motive."). This same principle has been upheld and applied in the context of cases arising from the Capitol Riot. *Chansley*, 525 F. Supp 3d at 164; *United States v. Robertson*, 2022 WL 969546 at \*6 (D.D.C. 2022) (Cooper, J.) ("If Robertson had expressed his views only through social media, he almost certainly would not be here. But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification. His words remain relevant to his intent and motive for taking those alleged actions.").

The Defendants are not being prosecuted *for* their speech. Instead, their speech is relevant and highly probative evidence of the corrupt intent behind their actions. *Id.* Among the defendants' charges are multiple counts which require the government to prove intent beyond a reasonable doubt. The First Amendment thus does not bar the admission of any evidence which the government offers to establish the Defendant's motive, intent, or an element of the crime, including that their actions that day were intended to stop the certification of the Electoral College vote. *Mitchell*, 508 U.S. at 489. The Court should therefore find that the government may introduce these statements as probative of the defendants' intent. *Id.*

2. <u>The Defendants should be precluded from arguing that his conduct was protected by the First Amendment.</u>

a. *The area around the Capitol had been lawfully closed and the Defendants had no First Amendment right to breach that restricted perimeter.*

The Court should preclude the Defendants from eliciting evidence, arguing, or asking questions that suggest that there was a First Amendment right to protest inside the restricted area around the Capitol on January 6. At trial, the government will show that the Capitol Grounds were restricted that day.  There is no First Amendment right to protest in a restricted area. The government can—and on January 6, 2021—did restrict an area that is a traditional public forum for legitimate government ends. This Court has affirmed that the government may close a public forum in similar circumstances. *See Mahoney v. U.S. Marshals Service*, 454 F. Supp 2d 21, 32-33 (D.D.C 2006) (U.S. Marshals Service did not violate First Amendment by restricting access to sidewalk in front of St. Matthew's Cathedral for Red Mass, even though sidewalk was a traditional public forum).

Other courts have similarly upheld temporary closures of traditional public fora for safety reasons. *See Mahoney*, 454 F. Supp. 2d at 21; *Menotti v. City of Seattle*, 409 F.2d 1113, 1129-1130

14

(9th Cir. 2005) (finding that an emergency order to close a core area of downtown Seattle to protests during World Trade Organization conference was constitutional in part because its purpose was to maintain and restore civic order); *Marcavage v. City of New York*, 489 F.3d 98, 105 (2d Cir. 2012) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.2d 1212, 1222 (10th Cir. 2007) ("In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order'); *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (upholding a street closure plan around the Democratic National Convention that made it nearly impossible for groups wishing to demonstrate to do so within sight and sound of delegates).

On January 6, 2021, the United States Capitol Police and the United States Secret Service coordinated to establish a restricted perimeter around the Capitol building that encompassed a portion of the Capitol grounds. That restricted perimeter was for a legitimate government purpose. No member of the public, including the Defendants, had a First Amendment right to engage in protest or speech within that restricted area. The Court should therefore enter an order precluding the Defendants from arguing to the contrary or stating during *voir dire*, questioning, or opening or closing statements that they were engaged in protected speech or pursuing their "right" to protest at any point when they were on U.S. Capitol grounds.

   b. *The Defendants' conduct within the breached restricted perimeter was not protected by the First Amendment.*

The First Amendment to the United States Constitution protects many sacred rights, but the right to engage in violence is not among them. *Grayned v. City of Rockford*, 408 U.S. 104, 116 ("Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment."). "Activities that injure, threaten, or obstruct are not protected by the

First Amendment, whether or not such conduct communicates a message." *United States v. Gregg*, 226 F.3d 253, 267-268 (3d Cir. 2000). Even conduct which is not outright violent but which physically "obstructs or unreasonably interferes" with official functions of government business loses its First Amendment protection. *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (finding that a picket demonstration which physically blocked ingress or egress from a courthouse was not protected by the First Amendment); *see also Cox*, 379 U.S. at 555 (physical "cordon" of a street or a public or private building by demonstrators who refused to let anyone pass if they "did not agree to listen to their exhortations."). Importantly, that some aspect of an individual's conduct was protected by the First Amendment does not negate criminal action for his unprotected conduct because "when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). That is to say that even if a defendant is engaged in speech that is protected, when his actions turn physically obstructive or outright violent, the First Amendment ceases to protect the speech itself because the government has a legitimate interest in preventing or stopping violent conduct. *Id.*; *see also Grayned*, 408 U.S. at 116. These First Amendment principles have been applied and upheld with respect to the January 6 Capitol Riot. *See*, *e.g.*, *United States v. Nordean et al.*, 579 F.Supp.3d 28, 53-55 (D.D.C. 2021) (Kelly, J.) (finding that charges for violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1512(c)(2) withstood constitutional scrutiny).

The Defendants' conduct on January 6 was plainly not protected by the First Amendment. *Id.* On January 6, 2021, the Defendants joined a riotous mob that had descended upon the Capitol, completely obstructing the flow of people, including the Vice President of the United States and other lawmakers inside, from ingress or egress from the building without the consent of the mob.

*Cox*, 379 U.S. at 555; *Johnson*, 390 U.S. at 617. Their actions, as two among many in the mob, had the effect of impeding and obstructing official government business, that being the certification of the Electoral College vote, for hours. *Id.* When law enforcement officers attempted to secure the bike rack barricades on the West Plaza in the face of the increasingly aggressive mob with the defendants standing at the very head of that mob, the defendants lashed out, threw their bodies into the bike racks, and began striking the officers repeatedly when the officers attempted to push them away. *Grayned*, 408 U.S. at 116; *Gregg*, 226 F.3d at 267-268. That the defendants' conduct early in the day on January 6 was protected by the First Amendment is of no moment in light of their breach of a restricted perimeter, assaults on law enforcement, and obstructive conduct against law enforcement as they attempted to secure the area around the Capitol: the moment they engaged in such conduct he crossed beyond the boundary of conduct protected by the First Amendment. *Id*; *see also Grayned*, 408 U.S. at 116. Permitting the defendants to argue that their conduct was protected by the First Amendment, in addition to running contrary to well-established law, risks confusing the issues and the jury. Fed. R. Evid. 401. Therefore, the court should preclude the defendants from raising this defense.

### F.     This Court Should Preclude The Defendants From Arguing In A Manner That Encourages Jury Nullification

The defendants should be prohibited from arguing or introducing evidence that encourages jury nullification, whether during voir dire or at trial.  As the D.C. Circuit has made clear,

> A jury has no more "right" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983). Evidence that only serves to support a jury nullification argument or verdict has no relevance to guilt or innocence. *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendant").

The government has identified the following subject areas that are not relevant to the issues before the jury and that could serve as an improper invitation for the jury to nullify its fact-finding and conclusions under the law. The Court should preclude any reference to these issues, or similar arguments, either during voir dire, argument or questioning by counsel, or in the defense case-in-chief.

### 1.    Selective Prosecution

The defendants may claim that they have been unfairly singled out for prosecution because of their political views. But a "selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Regardless of whether alleged discrimination based on political views is a proper basis for challenging the indictment—which the defendants have not claimed to date—it has no place in a jury trial. *See United States v. King*, No. 08-cr-002, 2009 WL 1045885, at *3 (D. Idaho Apr. 17, 2009) ("The Court will therefore exclude any evidence or argument as to selective prosecution at trial."); *United States v. Kott*, No. 3:07-cr-056, 2007 WL 2670028, at *1 (D. Alaska Sept. 10, 2007) (precluding the defendant from educing evidence to support a selective prosecution claim at trial). Rather, such an argument could serve as an improper invitation for the jury to nullify its fact-finding and conclusions under the law; the defendants should therefore be

precluded from making it.

**2.      Statements Regarding The Alleged Offenses' Punishment Or Collateral Consequences of Conviction**

The defendants may face prison time were they to be found guilty in this case, and they should not be permitted to arouse the jury's sympathy by introducing any evidence of or attempting to argue about the hardships of prison or the potential effect of incarceration on his family or employment prospects.

It is settled law that the jury should not consider such penalties in reaching its verdict. *See, e.g.*, *United States v. Reed*, 726 F.2d 570, 579 (9th Cir. 1984) (a defendant's possible sentence "should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused."); *Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should have been admonished that it "had no sentencing function and should reach its verdict without regard to what sentence might be imposed"). Courts in this district often give a jury instruction stating exactly that:

> The question of possible punishment of the defendant in the event a conviction is not a concern of yours and should not enter into or influence your deliberations in any way. The duty of imposing sentence in the event of a conviction rests exclusively with me. Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all.

D.C. Redbook 2.505. Thus, the above-mentioned issues are irrelevant, and any reference to them would invite jury nullification. *See United States v. Bell*, 506 F.2d 207, 226 (D.C. Cir. 1974) ("evidence which has the effect of inspiring sympathy for the defendant or for the victim . . . is prejudicial and inadmissible when otherwise irrelevant") (internal citation omitted); *United States v. White*, 225 F. Supp. 514, 519 (D.D.C 1963) ("The proffered testimony (which was clearly designed solely to arouse sympathy for defendant) was thus properly excluded."). As such, they should be excluded.

G.     **This Court Should Preclude The Defendants From Arguing Self-Defense Or Defense Of Others**

The defendants have not formally raised a claim of self-defense or defense-of-others.  If they do, such arguments and evidence should be precluded.  To establish a prima facie case of self-defense, the defendants must make an offer of proof of "(1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances." *United States v. Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006).  "If a defendant cannot proffer legally sufficient evidence of each element of an affirmative defense, then he is not entitled to present evidence in support of that defense at trial." *United States v. Cramer*, 532 F. App'x 789, 791 (9th Cir. 2013) (citing *United States v. Bailey*, 444 U.S. 394, 415 (1980)).

There is no reasonable argument that self-defense or defense-of-others are valid excuses for the offenses alleged under 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e). However, defendants like the Middletons who are charged under 18 U.S.C. § 111(a) may assert, as an affirmative defense, a theory of self-defense, "which justifies the use of a reasonable amount of force against an adversary when a person reasonably believes that he is in immediate danger of unlawful bodily harm from his adversary and that the use of such force is necessary to avoid this danger." *United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982).

This defense contains two important limitations.  First, Congress enacted Section 111 "to protect both federal officers and federal functions." *United States v. Feola*, 420 U.S. 671, 679 (1975).  As a result, "[a]n individual is not justified in using force for the purpose of resisting arrest or other performance of duty by a law enforcement officer within the scope of his official duties." *United States v. Drapeau*, 644 F.3d 646, 653 (8th Cir. 2011); *see also United States v. Branch*, 91 F.3d 699, 714 (5th Cir. 1996) ("[Self-defense] principles must accommodate a citizen's duty to

accede to lawful government power and the special protection due federal officials discharging official duties.").  Second, even in circumstance where an individual might be justified in using some force to resist a federal officer, that resistance must be reasonable under the circumstances. *See Abrams v. United States*, 237 F.2d 42, 43 (D.C. Cir. 1956) (observing that "the use of 'reasonable force' only would have been open to defendants"); *see also United States v. Wallace*, 368 F.2d 537, 538 (4th Cir. 1966) (explaining that Section 111 permits "reasonable force employed in a justifiable belief that it is exerted in self-defense"); *United States v. Perkins*, 488 F.2d 652, 655 (1st Cir. 1973) (defendant may be convicted under Section 111 where "he used more force than was necessary to protect the person or property of himself or others").

Both limitations apply here.  The evidence that the Government has disclosed and intends to introduce at trial shows that the defends and their fellow rioters were illegally present in a restricted area of the Capitol and were violently engaging law enforcement officers. Specifically, the evidence shows the defendants striking law enforcement officers who were attempting to establish a barricade line against the advancing rioters. Their assaults do not appear to have been targeted at any particular officer but instead committed so that the rioters could continue their advance to the Capitol.  "A defendant cannot claim self-defense if he was the aggressor or if he provoked the conflict upon himself."  *Waters v. Lockett*, 896 F.3d 559, 569 (D.C. Cir. 2018) (internal quotation marks and citation omitted).  That principle applies fully to Section 111 prosecutions. *See, e.g., United States v. Mumuni Saleh*, 946 F.3d 97, 110 (2d Cir. 2019) ("Mumuni was the initial aggressor in the altercation with Agent Coughlin; as such, he could not, as a matter of law, have been acting in self-defense"); *United States v. Acosta-Sierra*, 690 F.3d 1111, 1126 (9th Cir. 2012) ("[A]n individual who is the attacker cannot make out a claim of self-defense as a justification for an assault.").

Even accepting that the defendants have a right to resist the officers attempting to establish a police line in the course of a riot—which they did not—the evidence shows that the Defendant escalated the encounter into a violent attack on the victim-officers. *See Waters v. Lockett*, 896 F.3d 559, 570 (D.C. Cir. 2018) (self-defense is not applicable "if [the defendant] and his co-conspirators used excessive force to repel [the] attack"). The defendants' violent conduct was not necessary to defend themselves or others, as they simply could have returned home instead of continuing their unlawful presence on restricted Capitol Grounds. The force they used to resist was unreasonable and, accordingly, disqualifies them from any claim of self-defense. *Abrams*, 237 F.2d at 43; *Wallace*, 368 F.2d at 538.

The defendants' anticipated attempt to argue or submit evidence that their assaultive conduct was in defense of other rioters, including each other, on the West Plaza should also be barred. First, such a defense would be directly counter to the facts of this case: the video evidence provided in discovery shows that Mark Middleton threw his body into the barricade and began pushing against it *before* any officer physically engaged with either him or Jalise Middleton, that the officers used reasonable force against Mark Middleton after he began trying to overcome the barricade and pushing it against the officers, and that Jalise Middleton then assaulted the officers as they were attempting to stop Mark Middleton's assaultive and riotous conduct. Any claim of defense of others should therefore be excluded to avoid confusing or misleading the jury. Fed. R. Evid. 403. Second, such a claim would be barred as a matter of law. When an individual uses force to come to the aide of another who is not justified in their initial use of force against a third person, then the claim of defense of others does not apply. *Fersner v. United States*, 482 A.2d 387, 390 (App. D.C. 1984) ("The trial court correctly observed that the right to use force in defense of a third person is predicated upon that other person's right of self-defense (citing *Taylor*

*v. United States*, 380 A.2d 989, 994-995 (D.C. 1977)). Here, any person to whom the Defendant could possibly claim that he was coming to the aide or defense of would also be actively committing another federal offense, such as a violation of 18 U.S.C. § 231(a)(3), 18 U.S.C § 1752(a), or 18 U.S.C. § 111(a). The defendants cannot claim that their assaults against the officers were in the defense of another who was also assaulting federal law enforcement officers because that person's physical engagement with the officers would itself be unlawful. *Saleh*, 946 F.3d at 110; *Acosta-Sierra*, 690 F.3d at 1126. The defendants should therefore be barred as a matter of law from arguing that his actions were in the defense of another person. *Fersner*, 482 A.2d at 290; *see also United States v. Alberts*, 21-cr-26 (CRC), Oral Ruling Precluding A Jury Instruction for Self-Defense or Defense of Others, April 18, 2023 ("In order to […] establish the right to an instruction or to justify [a self-defense] instruction, there must be sufficient evidence from which a reasonable juror might infer that either the defendant did not know the identity of the law enforcement officer […] or that the law enforcement officer's use of force viewed from the perspective of a reasonable officer at the scene was objectively unreasonable under the circumstances." (citing *Drapeau*, 644 F.3d 646, and *Branch*, 91 F.3d 699)).

### H.   This Court Should Preclude The Introduction Of The Defendants' Good Conduct Or Culpability Relative To Other Rioters

The defendants tried to impede law enforcement officers on January 6, 2021. The Court should preclude any argument that the defendants' lack of additional criminal actions on January 6, 2021 or allegedly helpful acts negate their criminal conduct for which they are charged. *See United States v. Camejo*, 929 F.2d 610, 612-13 (11th Cir. 1991) (a witness's proffered testimony that a defendant declined to participate in a separate, contemporaneous narcotics conspiracy was an inadmissible "attempt to portray [the defendant] as a good character through the use of prior 'good acts'"). Indeed, such evidence would not be particularly probative of whether the

defendants are guilty of the offenses with which they are charged; many Capitol Riot defendants acted both violently and helpfully towards law enforcement at different times on January 6, 2021. *See, e.g.*, Government Sentencing Submission, *United States v. Fairlamb*, No. 21-cr-120 (D.D.C. Nov. 3, 2021), ECF No. 50 at 14-19 (defendant who offered police officers water and offered to assist them in leaving the area subsequently shoved and punched another officer).

Evidence of past "good acts" by a defendant is generally not probative unless a defendant is alleged to have always or continuously committed bad acts or engaged in ceaseless criminal conduct. *United States v. Damti*, 109 Fed. Appx. 454, 455-56 (2nd Cir. 2004) (citations omitted). Ceaseless conduct occurs when it is alleged that all the defendant's actions were illegal. *Id*. When that is not alleged and the prosecution can point to specific criminal acts, then evidence of good acts is not probative of the issue of guilt at trial. *Id*. Using specific instances of good acts "to prove lack of intent . . . is not only disfavored, it is not permitted under Rule 405(b)." *United States v. Marrero*, 904 F.2d 251, 259–60 (5th Cir. 1990) (affirming decision to exclude evidence that the defendant "provided more services to some clients than they were actually billed for and that sometimes she rendered services free of charge," which the defendant sought to introduce to show that she did not intend to improperly bill a government agency for medical services).

Even if probative, however, introducing evidence about the defendants' irrelevant conduct risks confusing the issues by inviting the jury to weigh the defendants' culpability relative to other rioters, and ought to be excluded. *See United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001) ("Evidence that is admissible under Rule 404 may nonetheless be excluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"). Any alleged specific good acts by the defendants are not connected to the issues of this case. Introducing evidence of such acts carries

an unnecessary risk of distracting the jury by allowing it to decide based, not on whether the evidence showed that the defendants committed the charged crimes, but instead on whether the defendants performed unrelated good deeds.

## CONCLUSION

Motions in limine are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070 (3d Cir. 1990)). The government presents these issues to the Court to prepare this case for an efficient trial. For the reasons described above, the United States respectfully requests that this Court grant the government's motion in limine.  If this Court determines an evidentiary hearing is necessary to rule on this motion, the government asks that the hearing be held in camera and ex parte.

Respectfully submitted,

DATED: June 26, 2023

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Sean P. McCauley
SEAN P. McCAULEY
New York Bar No. 5600523
Assistant United States Attorney
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Sean.McCauley@usdoj.gov

Brendan Ballou
DC Bar No. 241592
Special Counsel
United States Attorney's Office
For the District of Columbia
601 D Street NW
Washington, DC 20001
(202) 431-8493
brendan.ballou-kelley@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:21-CR-367** |
| | : | |
| **MARK MIDDLETON &** | : | |
| **JALISE MIDDLETON** | : | |
| | : | |
| Defendants. | | |

## <u>ORDER</u>

This matter having come before the Court pursuant to the Government's motion seeking to preclude certain defense arguments, filed on June 26, 2023, is hereby:

**ORDERED** that the Government's Motion is **GRANTED.** Specifically, the defendants are precluded from introducing evidence or making arguments:

(1) On the specific location of security cameras in the U.S. Capitol;

(2) On specific Secret Service tactics and emergency operations;

(3) That their conduct was authorized by former President Trump or other officers or officials;

(4) That any inaction by law enforcement made their conduct legal;

(5) That the First Amendment permitted their conduct;

(6) On any matter that encourages jury nullification;

(7) That they defended themselves or others on January 6, 2021; and

(8) On their prior good acts, or relative culpability to other actors on January 6, 2021.

_____

The Honorable Randolph D. Moss