UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-cr-367 (RDM) |
| MARK MIDDLETON & JALISE MIDDLETON, | |
| Defendants. | |

<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

*"Ass whoopin' comin'" – Jalise Middleton, January 5, 2021*

*"We are on the front lines. We helped pushed down the barriers. Jalise and I got pepper-sprayed, clubbed, and tear gassed! We had to retreat but more patriots pushed forward! They're taking back our house!" – Mark Middleton, January 6, 2021*

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. As explained below, the government has calculated Mark Middleton's guidelines range to be 87-108 months and Jalise Middleton's guidelines range to be 78-93 months. For the reasons set forth herein, the government requests that this Court sentence Mark Middleton and Jalise Middleton each to 90 months, as well as three years of supervised release, $2,000 in restitution, and a fine.

## I.    INTRODUCTION

The defendants, Mark and Jalise Middleton, a married couple from north Texas, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police

1

officers, and resulted in more than 2.9 million dollars in losses.[1]

In the two weeks leading up to the January 6, 2021, assault on the United States Capitol, the Middletons researched the laws governing both the certification of the Electoral College vote and possession of weapons in D.C. They also took steps to procure weapons, including chemical spray and electroshock devices. On January 5, they took selfies in front of the metal barricades that formed the secure perimeter around the Capitol. They returned to the Capitol early in the morning of January 6 and again viewed the barricades marking the secure perimeter. After attending the rally at the Ellipse, they walked back to the Capitol and entered the secure perimeter of which they were by now well aware. Once at the Capitol, they advanced to the front line of the rioters. At the front line, each defendant assaulted two officers from the Metropolitan Police Department who were defending the Capitol. Mark Middleton assaulted one of the officers with a flagpole and Jalise Middleton scratched the face of another officer, causing injury.

Proud of their conduct, the defendants took to social media, starting while they were still on Capitol Grounds, to brag about their breach of the secure perimeter, assaults on police officers, and the fact that their violence helped to temporarily stop the certification process. At trial, both defendants lied under oath about their conduct on January 6, and neither has ever expressed any remorse. To the contrary, the defendants have sought to personally benefit by using the notoriety

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

of their crimes to both raise money and seek fame and recognition. The government recommends that the Court sentence both Mark and Jalise Middleton each to 90 months of incarceration, which reflects the gravity of their conduct and total lack of remorse.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense accompanying the Complaint, ECF 1-1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power.

### B.    The Middletons' Role in the January 6, 2021 Attack on the Capitol

<u>Planning For Violence Before January 6</u>

The Middletons understood that Congress would be certifying the electoral college results on January 6, 2021. Their social media posts demonstrated an intent to interfere with that certification. On December 15, 2020, in response to a message that included a screenshot describing the process by which the Electoral Ballots would be delivered to the joint session, the role of the Vice President, and the process by which ballots would be inspected, objected to, and debated, see Gov. Ex. 802.1, Mark offered clarifications about the process and concluded:

> No matter the final outcome from this point forward America will be a shit-show. Our country as we knew it is gone. We will have to either have a bloody civil war or Texas will need to secede from the union to at least save us. Once we leave if other states attempted to secede we will have to help them.

On January 4, 2021, in response to a post calling for prayers and asserting that there will be "very little peace moving forward," Jalise responded, "Sadly, you are correct, either way, war is coming." Then, on January 5, in response to a message asking how she felt about what was happening the next day, Jalise responded, "PUMPED. Ass whoopin comin'! We're done."

3

The Middletons also planned to bring weapons to D.C. On December 29, 2020, Jalise complained to Mark about firearms restrictions in D.C. and remarked,

> [N]obody is going to try to bring guns in without the guarantee of a large group[.] […] Further, these would be FELONY charges so far from home. […] [W]ith that said, I don't go anywhere planning to be a sitting duck. I carry a gun on my hip every day, so I bought mace, darts and a taser, that I'm having driven in so that I can Carry [sic] it on the March.

Unsatisfied with being unarmed in Washington, Mark told Jalise and another individual: "We got our mace, stun gun at Cabela's. But you could go to any gun store and buy them. Stun gun and mace is legal in checked bags." See Gov. Ex. 702 at 14.

The Middletons expressed an interest in a number of events that were set to take place in connection with the certification of the Electoral College vote on January 6, 2021. See Trial Tr., 2/8/2024 at 82:7-17; see also id. at 174:9-25. Both of them reviewed a map with times and locations of events that were set to take place on January 6. Id.; see also Gov. Ex. 720. Among these events, according to the map, were a "March on Congress," a "Jericho March," and a "Wild Protest." The information for the "Wild Protest" included several hashtags, including #DoNotCertify and #StoptheSteal.

<u>The Middletons' Activities on January 5</u>

On January 5, the Middletons travelled from Texas to Washington, D.C. Upon arriving in Washington, they checked into their hotel before venturing out into the city. One of the Middletons' first stops on January 5 was the Capitol, where they learned that the public was not permitted on Capitol grounds. They posed for a selfie in front of the bike rack barricades and "AREA CLOSED" signs that marked the secure perimeter on the north side of the Capitol. See Gov. Ex. 703.

4



*Figure 4 (Gov. Ex. 703).*[2]

They also went to the west side of the building, where Mark took a photo of the snow fencing, bike rack barricades, and "AREA CLOSED" on the West Front. *See* Gov. Ex. 804.

<u>Early Morning Activities and Approach to the Capitol</u>

On the morning of January 6, the Middletons left their hotel and went directly to the Capitol. *See* Gov. Ex. 304; *see also* Trial Tr., 2/8/2024 at 171:6-16. Mark wore a gray jacket, blue jeans, a red Trump-branded scarf, and a red Trump-branded knit hat. Jalise wore blue jeans, a long black jacket, a blue Trump-branded scarf, and a blue Trump-branded knit hat. Both Middletons carried a flagpole. At the Capitol, they walked down First Street along the west perimeter of the restricted grounds. *See* Figure 4. During this walk, the Middletons again could see that the public was not permitted on Capitol grounds.

---

[2] Jalise Middleton is indicated with red arrows or circles throughout. Mark Middleton is indicated with yellow circles or arrows.



*Figure 4 (Gov. Ex. 218)*

Jalise photographed protestors standing in front a short stone wall, in which the "AREA CLOSED" signs are visible, *see* Figure 5, and took another selfie in front of the Capitol in which the "AREA CLOSED" signs that were arrayed across the West Lawn of the Capitol can be seen in the background, *see* Gov. Ex. 705.



*Figure 5 (Gov. Ex. 704).*                    *Figure 5 (detail).*

From First Street, the Middletons walked to the area around the Washington Monument for the "Stop the Steal" rally before walking back to the Capitol after the former President's speech.

6

<u>The Middletons' Criminal Conduct at the Capitol</u>

Prior to the Middletons' arrival on Capitol grounds, a series of events happened there in rapid succession. At just before 1:00 p.m.., rioters breached the restricted perimeter at the Peace Circle, *see* Gov. Ex. 217 at 0:20-0:31, and quickly overran the West Lawn and West Plaza, *see* Gov. Ex. 215 at 0:00-0:24. Shortly after 1:00 p.m., MPD officers were called to the Capitol to assist the overwhelmed Capitol Police. Starting at approximately 1:12 p.m., the MPD and USCP officers established a line of bike racks in the West Plaza to separate the swelling mob from the Capitol. *Id.* at 0:26-0:51. By 1:29 p.m., this line extended the length of the plaza. *Id.* Officers stood on the opposite side of the barricades to try to prevent rioters from advancing. *Id.* The rioters were undeterred, and many began to assault police to try to overrun the police line. *Id.* at 0:51-1:53.

At approximately 1:30 p.m., the Middletons entered the restricted perimeter near the Peace Circle and First Street NW and advanced toward the Capitol across the West Lawn. *See* Figure 6.



*Figure 6 (Gov. Ex. 219 at 0:20)*

Between 1:30 p.m. and 2:07 p.m., the Middletons advanced closer to the West Plaza and the Capitol Building. As they made their way towards the West Plaza, the Middletons saw they were entering the scene of a riot: the extensive set of barricades that they had seen on at least three

separate occasions had been toppled, *see* Gov. Ex. 704 and 219, rioters were climbing up the media tower that had been constructed for the upcoming inauguration, *see* Gov. Ex. 713-714, rioters were climbing up lamp poles, *see* Gov. Ex. 716, and rioters were reacting to the pepper spray being used defensively by police, *see* Gov. Ex. 717.

At 2:07 p.m., the Middletons reached the front line of rioters confronting the police line defending the West Plaza. *See* Gov. Ex. 204 at 01:49-01:58. Now feet from the police line and the barricades, the Middletons embraced each other. *See* Figure 7.



*Figure 7 (Gov. Ex. 221)*

Once at the front of the rioters, the Middletons used their scarves to cover their faces against the chemical irritants in the air and began chanting with the crowd: "U-S-A! U-S-A!" *See* Figure 8; see also Gov. Ex. 207 at 1:56-2:21.



*Figure 8 (Gov. Ex. 207)*

From their position at the front of the riot, the Middletons heard a loud warning alarm and recorded message broadcast by the police: "By order of the Metropolitan Police, this area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. Failure to comply with this order may   subject you to arrest." *See* Gov. Ex. 206 at 1:40-2:03. Officers immediately in front of the Middletons were also repeatedly instructing rioters to not come near the rails and to not touch the rails. *See id.* at 1:40-2:20; *see also* Gov. Ex. 207 at 2:49-2:58; *see also* Gov. Ex. 204 at 02:00-02:20. In response to these instructions, Mark Middleton called out to the officers: "Why are you all doing this? Quit being traitors." *Id.*

At 2:09 p.m., the barricade line in front of the Middletons began to bend, creating a weak point in the line. Trial Tr., 2/6/2024 at 228:19-229:1. In response, MPD officers began to push the barricades back in place to straighten the line. *See* Gov. 204 at 3:26-3:40; *see also* Gov. Ex. 202 at 3:26-3:40. Despite having ample space around them to  retreat, the Middletons chose instead to brace themselves and forcefully resist the police officers' efforts to restore the line. *See* Figure 9; *see also* Gov. Ex. 221 at 1:50-1:59; *see also* Gov. Ex. 221.1. They threw their bodies into the

9

barricades and the officers behind those barricades. *See* Gov. 204 at 3:26-3:40; *see also* Gov. Ex. 202 at 3:26-3:40. As she initiated her push, Jalise took a step forward to increase the amount of force that she was about to apply to the barricades and the officers behind it and then threw the full weight of her body into the barricades. *See* Gov. Ex. 202 at 3:34-3:38.



*Figure 9 (Gov. Ex. 221 at 1:57)*

As the Middletons pushed against the barricades, the officers continued to give them verbal commands to "get back." *See* Gov. 204 at 3:26-3:40; see also Gov. Ex. 202 at 3:26-3:40; *see also* Gov. Ex. 203 at 3:25-3:50. While both Middletons ignored these commands, Mark took a wide stance and pushed with the full force of his body to maximize the amount of force that he was applying to the barricades. *See* Figure 10; *see also* Gov. Ex. 203 at 3:30-3:39. Jalise continued to push against the bike racks. *See* Figure 11; *see also* Gov. Ex. 202 at 3:38-3:55.



*Figure 10 (Gov. Ex. 203 at 3:37).*                    *Figure 11 (Gov. Ex. 202 at 3:41).*[3]

The officers continued to order the Middletons to get back and break contact with the barricades, but they refused to comply and continued to actively resist the officers' efforts. When an officer struck at the metal barricades to get Mark Middleton to release his grip on them, Mark Middleton did not comply but instead shouted, "Fuck you!" *See* Gov. Ex. 203 at 3: 40-3:46.

As the Middletons pushed the barricade, MPD Officer T.T. was ten to fifteen feet to the south. Having seen a break in the line on the West Plaza moments earlier, *see* Gov. Ex. 221.1 at 0:00-0:44, Officer T.T. moved to prevent the Middletons from causing another break. *See* Gov. Ex. 207 at 3:50-3:57; *see also* Trial Tr., 2/7/2024 at 28:17-29:9. Officer T.T. recognized that Mark, by pushing on the barricades, was functioning as an agitator. *See* Trial Tr., 2/7/2024 at 25:17-20. To separate Mark from the crowd and deescalate the situation, Officer T.T. called out to the other

---

[3] Figures 10 and 11 are from the same moment per the timestamp of the respective body worn cameras: 14:09:37.

officers around him, "Snatch him!" and indicated towards Mark. *See* Gov. Ex. 207 at 3:50-3:57; *see also* Trial Tr., 2/7/2024 at 28:17-29:9.  He then reached for Mark himself. *Id.*

As Officer T.T. reached for him, Mark moved out of the way, causing Officer T.T. to make contact with Jalise, who immediately lashed out at Officer T.T. First, Jalise pulled him by his arm over the barricades and towards the mob of rioters. *See* Gov. Ex. 206 at 3:55-4:00. In her assaultive efforts, she was joined by Mark, who also grabbed Officer T.T.'s left arm and tried to pull him over the barricades. *Id.* While Jalise and Mark were holding Officer T.T.'s left arm, Jalise, who was still gripping Officer T.T.'s arm with her right hand, then struck him with her left hand multiple times about his arms, chest, and face. *See* Gov. Ex. 206 at 3:55-4:10; *see also* Gov. Ex. 207 at 3:50-4:10. All this time, both the Middletons continued to pull at him.

One of Jalise Middleton's strikes with her left hand, which had long fingernails and was adorned with a large diamond ring, made physical contact with Officer T.T.'s face.  Officer T.T. experienced pain from this attack and the resulting scratch to his face. Trial Tr., 2/7/2024 at 23:1-9. The pepper spray and other chemical irritants in the air made the pain worse. *Id.* at 23:13-20.

MPD Officer R.C. saw Officer T.T. being assaulted by the Middletons and came to his aide. Initially, Officer R.C. tried ordering the Middletons to let go of Officer T.T. and stop their assaults. When it became clear that the Middletons were not going to stop their attack, *see* Gov. Ex. 206 at 4:01-4:09, Officer R.C. struck at the Middletons' arms with his baton. The Middletons were undeterred. Mark escalated his attacks, by turning his flagpole into a club and striking Officer R.C. in the head with a it. *See* Figure 12a.



*Figure 12a (Gov. Ex. 221 at 2:15). Officer T.T. is indicated with a blue circle.*
*Officer R.C. is indicated with a green circle.*

While Officer R.C. tried to shield Officer T.T. from the Middletons' assaults, Jalise

grabbed the riot padding on Officer R.C.'s forearm and tried to pull him into the crowd along with

Officer T.T. *See* Figure 12b.



*Figure 12b (Gov. Ex. 206 at 4:06). Jalise's point of contact with Officer R.C. is indicated with a red arrow.*

While defending against the Middletons' assaults, Officer T.T. was unable to defend

himself against another rioter who struck Officer T.T.'s head with a PVC pipe. *See* Gov. Ex. 221

at 2:15-2:23. The Middletons' assault against the officers stopped only after Officer T.T. sprayed

them with his chemical irritant spray. *See id.*; *see also* Gov. Ex. 207 at 4:09-4:14. The Middletons retreated from the West Plaza with their eyes closed. At the moment that they began their retreat, their pushes against the barricade and assaults on the two police officers had their desired effect: the police line at that location briefly broke open. This break required the officers in the immediate area to go into the crowd, exposing themselves to further assaultive conduct and danger, to regain control of the barricades and re-establish the police line. *See* Gov. Ex. 221 at 2:18-2:44.

The Middletons remained on Capitol Grounds after leaving the West Plaza. Jalise Middleton, expressing pride in her conduct, photographed her face, *see* Gov. Ex. 718, and texted the photograph to an associate with a caption that mischaracterized the police use of pepper spray as "an attack." Mark saw the Upper West Terrace overrun and "logically concluded" that the mob became "enraged" after seeing what happened with him and his wife to the point that rioters "charged the line and busted through." Trial Tr., 2/8/2024 at 214:17-215:3. He documented the chaos unfolding on the Upper West Terrace. *See* Gov. Ex. 812; *see also* Gov. Ex. 813. In a self-recorded video, Mark bragged about what he and his wife had contributed to the riot:

> We are on the front lines. We helped pushed down the barriers. Jalise and I got pepper-sprayed, clubbed, and tear gassed! We had to retreat but more patriots pushed forward! They're taking back our house! They've got the giant flag up on the upper terrace up there. No more foolin' around! Jalise and I got to go back to the hotel and try to recoup and change. Get dry clothes on. Make America Great Again! Freedom!

Gov. Ex. 813.

After Mark posted this video to Facebook, the Middletons returned to their hotel. By the end of the day, they had walked nearly four miles.

<u>The Middletons' Statements After the Assault on the Capitol</u>

In the hours and days after assaulting Officers T.T. and R.C., the Middletons took to their

14

phones to boast about their crimes. Between January 6 and January 7, 2021, they both made numerous statements in which they accurately described their conduct in the West Plaza and showcased their pride. As the weeks wore on, they made statements in which they acknowledged the unlawfulness of the conduct and continued to show a lack of remorse.

### Jalise Middleton's Statements

Less than two hours after assaulting officers, Jalise stated that they were "on the front lines pushing into the capital [*sic*] and got past the fencing but then we got beat by a cop and pepper sprayed so we had to retreat but you see all our fellow patriots got in." Later that night, she boasted "we storm [*sic*] that motherfucking castle." She also described how her conduct assisted other rioters after she had retreated from the West Plaza, "We broke down the fencing stormed the capital [*sic*] got beat, pepper sprayed and gassed so we had to retreat but we got the others in the building!!!!" She then told a friend about how she had "no doubt" that those were "patriots" and, in response to a question about what happened inside of the Capitol, boasted that "[w]e were coordinating to break down the final long gates to get to the doors, beyond that, I can't account for anything." Late in the evening on January 6, Jalise described both her knowledge of the Vice President's presence at the Capitol and her appreciation of the immediate consequences of her riotous acts: "Pence should have sent back the votes due to fraud. Instead he started going through verifying each state. But we stormed the Capitol which stopped the count."

### Mark Middleton's Statements

On the evening of January 6, Mark Middleton had a conversation with another individual in which he stated that he and Jalise "helped break down the barriers and pushed the cops back." In response, this individual responded "sweet" and said that he was ready to come get Mark if

needed before adding "loading mags now…lol." Mark responded that there was no need for this individual to come to D.C. armed at that moment because they were "good now." But he continued that that, nevertheless, the individual needed to "get ready" because "[i]t's about time to do some patriot shit." Later that evening, echoing Jalise's comments about "storm[ing] the motherfucking castle," Mark shared an image from the 1987 movie *The Princess Bride*. *See* Figure 13



*Figure 13.*

Mark later made statements in which he showed an awareness of the criminal nature of his actions. On January 30, 2021, he said that he was fine since "[s]o far the fbi has not come visiting us." A week later, stated that he was "[j]ust living the life" while he "[w]aited on the feds to come visit."

**C.  The Middletons' Obstructive Conduct**

Both Mark and Jalise Middleton testified under oath at trial and both made numerous false statements about material issues. The jury's verdict of guilty on all counts necessarily means it did not credit their false testimony. In any event, the trial evidence demonstrates the ways in which their testimony was false.

<u>Jalise Middleton</u>

First, Jalise testified that when she "arrived at the police line, it looked very orderly. You had all of the bike racks lined out. And you had the police, you know, kind of elbow to elbow,

standing down the line. And they were actually, you know, talking and communicating with all of the protestors. But, I mean, there was tension in the air. I could feel tension in the air." Trial Tr., 2/8/2024, 93:9-14.  This testimony was relevant to the jury's determination of about whether a civil disorder was occurring and whether Jalise knew that she was entering both a restricted area and the scene of a riot.  It was directly contradicted by Gov. Ex. 221, which showed that, at the moment that the Middletons arrived at the police line in the West Plaza, there was a group of rioters attempting to break through the line immediately next to the defendants. Gov. Ex. 221 at 0:27-1:15. This exhibit also showed that there was tear gas in the air and concussive crowd control devices detonating. This testimony was also contradicted by Gov. Ex. 202-204 and 206-207, which show that officers were repeatedly yelling at rioters to stay away from the police line and vacate the area. *See, e.g.,* Gov. Ex. 204 at 01:49-01:58. This statement was also contradicted by the testimony of Captain Brooks, Trial Tr., 2/6/2024 at 31:21-25,[4] Officer R.C., Trial Tr. 2/6/2024 at 161:22-162:4, and Officer T.T., Trial Tr., 2/7/2024 at 14:18-15:5, all of whom testified to the chaotic nature of the situation in the West Plaza at the time of their respective arrivals, all of which overlapped to some degree with the Middletons' presence there.

Second, when asked, "did you move your body towards the [police] line." Trial Tr., 2/8/2024, 99:2, Jalise responded, "no." *Id.* at 99:3. When she was asked, "[h]ow did your body come to be in contact with the line," she responded, "I don't know, other than that barricades being pushed up against me." *Id.* at 99:4-6.  This testimony was relevant to the jury's determination of

---

[4] Captain Brooks put a particularly fine point on what she saw when she arrived on the West Front: "It was a hellscape. It was rioters in places they weren't supposed to be. They were up on the platform. They were yelling, screaming, cursing, throwing, hitting, jabbing, fighting, spraying us with chemical irritants. It was a hellscape."

whether Jalise Middleton knowing committed an act with the intended purpose of obstructing, impeding, or interfering with Officers T.T. and R.C. Jalise's testimony on this point was directly contradicted by Gov. Ex. 202, which shows that the barricades were not, in fact, pushed up against her. Rather, Jalise threw the full weight of her body into the barricade while bracing her feet against the ground. Gov. Ex. 202 at 3:26-3:40. This testimony was also contradicted by Gov. Ex. 221.1, which shows Jalise throwing her body into the bike rack barricade and the police behind it.

Third, Jalise denied that her Facebook posts and text messages describing her conduct at the Capitol were accurate, claiming that they were "extremely braggadocious," Trial Tr., 2/7/2024 at 106:10, and "[j]ust lying," *id.* at 107:6, to make her activities in Washington seem impressive, *id.* at 106:12-13. This testimony was material because in these posts and text messages, Jalise truthfully described her crimes on January 6, including that she helped push past the final line of police barricades, fought police, and, in doing so, helped other rioters gain access to the building and the proceedings inside which, in her words, "stopped the count" of the Electoral College. In fact, these statements were accurate, as demonstrated by Gov. Ex. 202-204, 206-207, 207.1, 207.2, 221, 221.1, and 221.2, all of which showed that Jalise was accurately describing her conduct at the Capitol on Facebook and in text messages, respectively admitted as Gox. Ex. 302 and 702.[5]

---

[5] *See, e.g.,*    Individual 5: What's going on down there
              Jalise Middleton: We fought the cops to get in the Capital (sic) and got pepper
              sprayed and beat but by gosh the patriots got in!
              Individual 5: Are you ok
              Jalise Middleton: Yes
              Individual 5: Why did they fight the cops?
              Jalise Middleton: To get in the Capital [*sic*] to send them bastards a clear message
              that this won't be tolerated
              Individual 5: True what happened once inside
              Jalise Middleton: We didn't make it in. We got pepper sprayed while fighting on
              front line

<u>Mark Middleton</u>

First, Mark claimed that he was unaware of the certification process that was happening in the Capitol that day and denied doing any research into the process. Trial Tr., 2/9/2024 at 74:12-13. Such testimony was material to whether he intended to obstruct the certification proceedings, as charged Count Four. This testimony was manifestly false. Just before giving this testimony, Mark admitted to a detailed—even nuanced—knowledge of Congressional procedures and the certification process such that offered corrections and clarifications to questions that he felt were inaccurate or misstated a point of procedure.[6] This testimony was also directly contradicted by Mark's own statements on Facebook and in text messages, in which Mark provided detailed descriptions of congressional procedures to his sister-in-law. *See* Gov. Ex. 304, 802, and 802.1.

Second, Mark claimed that, upon arriving at the police line in the West Plaza, he had a "cordial" interaction with a USCP Officer in which he was instructed to remove his hand from a barricade and immediately complied. Trial Tr., 2/7/2024 at 180:21-181:3. This false testimony was

---

*See also*       Jalise Middleton: Me and my husband were on the front lines pushing into the capital (sic) and got past the fencing but then we got beat by a cop and pepper sprayed so we had to retreat but you see all our fellow patriots go in

[6] "Being Pence is President of the Senate is he there – I am just surmising to myself. Is he there every single day. Well, no, the few times I have watched C-SPAN, when there is a tie vote that the vice president comes running over and break the tie vote. But I have rarely or never seen him sitting, presiding over the Senate while it is in session at any point in time. Granted, I have never watched the Electoral College being certified. So I really have no clue how it actually unfolds. I do know or are aware of the constitution language surrounding that. Just because he presides over it, doesn't mean he is right there. Because every other day, he presides over the Senate and he is not in the Senate." Trial Tr., 2/9/2024, 82.19-83:5; "Well, a lot of times she – the Speaker of the House steps aside and there is a speaker pro tem or a president pro tem over in the Senate, *So, honestly, I have no idea because I have never actually watched the proceeding happen. What's on paper in the constitution might be very, very different from what is happening in reality.*" *Id.* at 83.23-84.3 (emphasis added).

obviously to prevent the jury from concluding that he had a corrupt intent in the West Plaza or intended to assault officers. But Mark's testimony on this point was directly contradicted by Gov. Ex. 204, which showed that he approached the police line in the West Plaza at 2:07 p.m. and never had any interaction with a police officer prior to calling them "traitors," pushing his body into the barricades, and then yelling "fuck you." *See* Gov. Ex. 204 at 01:49-02:20. This testimony was further contradicted by Gov. Ex. 221.1, which also showed the Middletons walking up to the police line and never interacting with any police officer before assaulting two of them.

Third, on cross examination, Mark Middleton would not even acknowledge that the person approaching the police line for the first time at 2:07 p.m. was him despite the fact that it was clearly him. Trial Tr., 2/8/2024 at 238:18-20; *see also id.* at 239:6-240:16.[7] This statement was material to the government's entire case in that it effectively denied the identity of the person who, moments later, would assault Officers T.T. and R.C.

---

[7] Q: Mr. Middleton, do you see the person—this person right in here in the black puffy jacket?
A: Yes.
Q: Who is that behind him?
A: Someone wearing a hat similar to mine.
Q: And also a jacket similar to yours?
A: Possibly.
Q: And also jeans similar to yours?
A: That is possible?
Q: And you agree that person, you or not, just emerged from the crowd; correct?
A: Yes. But how many gray jackets, red Trump hats and jeans did they sell right before January 6?
 […]
Q: So, Mr. Middleton, between the time that person who is dressed identically to you arrives at the line out of the crowd at 2:07 and 30 seconds, between now and 2:08:43 when you yelled at these police officers, "Why are you all being traitors, quit doing this," when did that cordial interaction happen?
A: That cordial interaction happened when we were in this location here. What you are trying to conflate is that there was someone similar clothing a little bit over.

Fourth, Mark claimed that, at the first moment that he made contact with the barricades at 2:09 p.m., he was pushed into them by a rioter in a black hooded sweatshirt behind him and that he was unable to retreat. Trial Tr., 2/8/2024 at 193:4-194:14. This testimony was directly contradicted by Gov. Ex. 221.1, which showed the person in the black sweatshirt standing behind Mark. Although making contact with Mark Middleton, this person was looking away from him, had his arm bent, and was clearly not exerting force on Mark. *See* Gov. Ex. 221.1.

Fifth, Mark flatly denied knowing that Vice President Pence was present at the Capitol. Trial Tr., 2/9/2024 at 72:5-7. Specifically, he claimed: "I had no knowledge whatsoever that Mike Pence was in that building at any point that me and my wife were on Capitol grounds." *Id.* at 79:18-20. This was material to Counts Five through Seven, which, per the Court's jury instructions, required the government to prove that the defendant knew that Vice President Pence was or would be present inside of the restricted perimeter. Mark's testimony on this point was directly contradicted by Gov. Ex. 802 and Gov. Ex. 802.1. The latter was a screenshot recovered from Mark Middleton's phone, which had been sent to him by his sister-in-law on December 15, 2020. The text in this screenshot described the Vice President's role in the certification process and indicated that he would be present in the Capitol while the certification was happening and that he would presiding over the certification. Gov. Ex. 802 showed that on December 15, 2020, Mark, upon receiving Gov. 802.1, sent "clarifications" about Vice President Pence's presence on the grounds and role in the certification process to his sister-in-law. Trial Tr., 2/9/2024 at 79:4-84:10. Even after being confronted with these exhibits and reading them aloud to the jury, Mark persisted in falsely denying his knowledge that Vice President Pence was present in the Capitol. *Id.* at 82:4-85:14. Eventually, however, he was forced to admit that he knew that the Vice President would be

there at some point on January 6, 2021, in his role as president of the Senate, thus contradicting even his own prior sworn testimony. *Id.* at 85:18-21.

### D. The Middletons' Post-Conviction Conduct

Since their convictions, the Middletons have not expressed a modicum of remorse for their conduct and have, in fact, expressed ongoing pride in their crimes. Since their arrest and subsequent conviction, the Middletons have sought to capitalize off their crimes, bring themselves fame and notoriety, and have offered themselves up as unofficial leaders of what they describe as "the J6 community." In the approximately four months since their conviction, they have used social media channels to spread disinformation, advance baseless conspiracy theories about the events of January 6, and defame and disparage the police officers who defended the Capitol.

Starting mere hours after their conviction, the Middletons have used Twitter (now known as X) to advance lies about the January 6 riot, including false assertions that they did not commit the crimes of which they were convicted, and falsely accusing the police who defended the Capitol of instigating violence. *See* Attachment 1 at 1-3. The Middletons have also participated in interviews in which they showcased their total lack of remorse and reiterated lies they told during trial. For example, on March 21, 2024, the Middletons appeared on an internet program known as "The Real Deal Broadcast." *See* Gov. Sent. Ex. A. Sitting side-by-side, they lied at length about the details of their trial and their crimes. Of the jury's verdict, Jalise said, "Just like every other January 6 defendant that crosses that table, we were convicted before we ever got in there. Ours was a little unusual because we had such clear, precise video of our innocence and yet they convicted on nine charges." *Id.* at 15:01-15:28. The Middletons then reiterated many of the statements the jury did not credit at trial, and discussed the pride that they continue to take in their

crimes. Jalise, showcasing her unwillingness to be deterred in both her conduct and her lack of remorse then offered, "All you can do is martyr us. What are you going to do with someone who is not afraid to die?" *Id.* at 38:34-38:42. Towards the end of the interview, the Middletons discussed shirts they are selling to capitalize on their participation in the riot and to aggrandize that criminal conduct:

> Jalise Middleton: Go check out the store. We have some cool t-shirts in there.
> Mark Middleton: [showing his shirt] This is just one of them. We have J6 witness shirt.
> Traitor Joe—you'll love those. We have the J6 POW shirts.
> Jalise Middleton: And my favorite, the words got spoken to me early on and I've stood by them and that's "Jesus was accused of insurrection, too."[8]

*Id.* at 1:02:40-1:03:20

On April 11, the Middletons appeared on another internet program. *See* Gov. Sent. Ex. B. Mark Middleton quipped: "We didn't know this at the time and most of your listeners don't, but it is assaulting federal police officers if you have your back to them praying and they come up and start beating you with clubs and you turn around to shield yourself from the club strikes." *Id.* at 16:01-16:19. Regarding the assault, Jalise Middleton, mocked Officer T.T.: "He told the jury that I punched him in the face and it hurt." *Id.* at 19:23-19:28. Towards the end of the interview, they again began promoting the January 6-themed shirts they sell. *Id.* at 53:00-54:15

In early April 2024, the Middletons sat for another interview that was published in two parts in which they described their criminal case. *See* Gov. Sent. Ex. C-1 and C-2. In this interview, Mark decried the judicial process and continued to express his pervasive lack of remorse: "It doesn't matter if you have the very best lawyers in the America or if you represent yourself, you're

---

[8] Images of both of these shirts are in Attachment 1 at 4-5.

going to prison. *If we're able to save this nation, it would make everything we went through absolutely worth it.*" Gov. Sent. Ex. C-1 at 0:43-1:03 (emphasis added).

## III.   THE CHARGES AND CONVICTION

On December 1, 2021, a federal grand jury returned a superseding indictment charging Mark and Jalise Middleton with nine counts, including two counts of 18 U.S.C. § 111(a)(1) [assaulting, resisting, or impeding certain officers] and one count each of 18 U.S.C. § 231(a)(3) [civil disorder], 18 U.S.C. § 1512(c)(2) and 2 [obstruction of an official proceeding], 18 U.S.C. § 1752(a)(1) [entering or remaining in a restricted building or grounds] , (2) [disorderly conduct in a restricted building or grounds], and (4) [act of physical violence in any restricted building or grounds], 40 U.S.C. § 5104(e)(2)D) [disorderly conduct in a Capitol Building or grounds] and (F) [act of physical violence in a Capitol building or grounds]. On, February 13, 2024, a jury convicted Mark and Jalise Middleton of all nine counts.

## IV.   STATUTORY PENALTIES

The Middletons now face sentencing on all nine counts of the superseding indictment. As noted by the Presentence Report issued by the U.S. Probation Office, the defendants face the following statutory penalties:

- Counts 1 & 2: Assaulting, Resisting, or Impeding Certain Officers – up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $10;
- Count 3: Civil Disorder – up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100;
- Count 4: Obstruction of an Official Proceeding – up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100;
- Count 5: Entering or Remaining in a Restricted Building or Grounds – up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25;

- Count 6: Disorderly or Disruptive Conduct in a Restricted Building or Grounds – up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25;
- Count 7: Engaging in Physical Violence in a Restricted Building or Grounds – up to one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25;
- Count 8: Disorderly Conduct in a Capitol Building – up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10;
- Count 9: Act of Physical Violence in a Capitol Building – up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## IV.   SENTENCING GUIDELINES AND ANALYSIS

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "It is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted." *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997). To support the application of an enhancement, therefore, the government must show that it is "more likely than not" that the defendant engaged in the conduct encompassed by the enhancement. *Id*. While the Guideline calculations for the Middletons are similar, there are differences due to the nature of their assaults. Accordingly, the Government sets forth the calculation for each defendant separately.

### **Guidelines As to Mark Middleton**

<u>Count One:</u> 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Officer T.T.)

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the relevant conduct here is aggravated assault, so we apply §2A2.2.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony."  U.S.S.G. § 2A2.2 cmt. n.1. |

| | | Mark Middleton's felonious assault on Officer Toran was "aggravated assault" because it was committed with the intent to commit another felony, namely, 18 U.S.C. § 231(a)(3) or 18 U.S.C. § 1512(c)(2). |
|---|---|---|
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>Mark Middleton admitted that he knew the persons he attacked were police officers and acting in that capacity. Officer T.T was clearly identifiable as a police officer because he was wearing a full police uniform.<br><br>Defendant's assaults were motivated by the fact that Officer T.T. was performing his duties as a police officer by protecting the U.S. Capitol from the mob of rioters, including the defendant, whom Officer T.T. was trying to remove from the crowd when Mark Middleton assaulted him. |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See discussion of Mark Middleton's untruthful testimony, supra at 19-22.* |
| Total | 22 | |

<u>Count Two:</u> 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Officer R.C.)

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the relevant conduct here is |

| | | |
|---|---|---|
| | | aggravated assault, so we apply §2A2.2.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Mark Middleton's conduct was aggravated assault because was committed with the intent to commit another felony, namely, 18 U.S.C. § 231(a)(3) or 18 U.S.C. § 1512(c)(2). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +4 | U.S.S.G. §2A2.2(b)(2)(B): "If [...] (B) a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels." "Dangerous weapon" has the meaning given in § 1B1.1 [...] and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury."<br><br>Mark Middleton struck Officer R.C. in the head with the tip of his flagpole. Striking a person in the head with a pole demonstrates a clear intent to cause bodily injury to that person. Mark Middleton's strike with the flagpole was intended to cause Officer R.C. pain or injury such that he would not assist Officer T.T., whom the defendants were assaulting. |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>Mark Middleton admitted that he knew the persons he attacked were police officers and acting in that capacity. Officer R.C. was clearly identifiable as a police officer because he was wearing a full police uniform and riot gear.<br><br>Defendant's assaults were motivated by the fact that Officer R.C. was performing his duties as a police |

| | | |
|---|---|---|
| | | officer by protecting the Capitol from the mob of rioters, including the defendant. Mark Middleton's assault against Officer R.C. was further motivated by the fac that Officer R.C was attempting to stop the defendants from assaulting Officer T.T., who was also defending the Capitol against the mob. |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." <br><br> *See discussion of Mark Middleton's untruthful testimony, supra at 19-22.* |
| Total | 26 | |

<u>Count Three:</u> 18 U.S.C. § 231(a)(3), Interfering with Law Enforcement Officials During a Civil Disorder (Officers T.T. and R.C.).

Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, we use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the relevant conduct here is assault, so we apply §2A2.2. <br><br> Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1. <br><br> Mark Middleton's conduct was aggravated assault because was committed with the intent to commit another felony, namely, 18 U.S.C. § 231(a)(3) or 18 U.S.C. § 1512(c)(2). |
| Base Offense Level: | 14 | U.S.S.G. §2A2.2 |
| Adjustment | +4 | U.S.S.G. §2A2.2(b)(2)(B): "If [...] (B) a dangerous |

|  |  | weapon (including a firearm) was otherwise used, increase by 4 levels." "Dangerous weapon" has the meaning given in § 1B1.1 […] and includes any instrument that is not ordinarily used as a weapon (e.g., a car, a chair, or an ice pick) if such an instrument is involved in the offense with the intent to commit bodily injury."<br><br>*See analysis for Count 2 above.* |
|---|---|---|
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>*See analysis for Count 2 above.* |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See discussion of Mark Middleton's untruthful testimony, supra at 19-22.* |
| Total | 26 |  |

<u>Count Four:</u> 18 U.S.C. § 1512(c)(2), 2 – Obstruction of an Official Proceeding

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; (B) a closely related offense."<br><br>*See discussion of Mark Middleton's untruthful testimony, supra at 19-22.* |
| Total | 16 |  |

<u>Count Five:</u> 18 U.S.C. § 1752(a)(1) – Entering and Remaining in a Restricted Building or Grounds

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See § 1B1.2 n.1. Here, the most applicable guideline is § 2B2.3.

| Base Offense Level: | 4 | §2B2.3(a) |
|---|---|---|
| Obstruction and Related Adjustments | +2 | §2B2.3(B)(1)(A): "If the trespass occurred … in furtherance of the administration of justice, national defense, or national security, increase by 2 levels"<br><br>As proven through evidence at trial, the Capitol grounds and building were restricted grounds on January 6, 2021. |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above. |
| Base Offense Level (adjusted) | 14 (from Count 4) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Mark Middleton entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work.  The substantive offense is thus Count Four, and the base offense level for that offense should be applied. |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |

30

|  |  | *See discussion of Mark Middleton's untruthful testimony, supra at 19-22.* |
|---|---|---|
| Total | 16 |  |

<u>Count Six:</u> 18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4.

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If the offense involved physical contact."<br><br>As the jury specifically found, Counts One and Two both involved physical contact with, respectively, Officers T.T. and R.C.. |
| Cross-reference |  | Pursuant to U.S.S.G. §2A2.4, the Base Offense Level is 10. But U.S.S.G. §2A2.4(c) directs that the cross-reference in §2A2.2 applies "if the conduct constituted aggravated assault."<br><br>"Aggravated assault," under n.1 to §2A2.2 "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury with that weapon; (B) serious bodily injury; or (D) an intent to commit another felony." |
|  | 14 | U.S.S.G. § 2A2.2 |
| Special Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2) Dangerous weapon was brandished or used.<br><br>*See analysis for Count 2, above.* |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |

31

|  |  | *See discussion of Mark Middleton's untruthful testimony, supra at 19-22.* |
|---|---|---|
| Total | 20 |  |

Count Seven: 18 U.S.C. § 1752(a)(4) – Engaging in Physical Violence in a Restricted Building or Grounds

| Base offense level | 14 | U.S.S.G. §2A2.4(a), cross-referenced to §2A2.2(a)<br><br>Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."<br><br>*See analysis for Count 1 above.* |
|---|---|---|
| Special Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2) Dangerous weapon was brandished or used.<br><br>*See analysis for Count 2, above.* |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>*See analysis for Count 2 above.* |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See discussion of Mark Middleton's untruthful testimony, supra at 19-22.* |
| Total | 26 |  |

Count Eight: 40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

32

<u>Count Nine:</u> 40 U.S.C. § 5104(e)(2)(G) – Parading, Demonstrating, or Picketing in a Capitol Building

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

<u>Criminal History Category and Grouping Analysis as to Mark Middleton</u>

Mark Middleton's offenses fall into three separate groups.

- Group One relates to the assault on Officer R.C. which is Mark Middleton's most serious assault, and consists of Counts Two and Seven. Count Three is also part of Group One because the assault on Officer R.C. is conduct that is embodied in a specific offense characteristic applied to Count Three, specifically the use of a dangerous weapon. The offense level for Group One is 26, based on the highest offense level within this Group, which comes from Counts Two and Three.
- Group Two relates to the assault on Officer T.T. and consists of Count One. The offense level for Group Two is 22.
- Group Three relates to Mark Middleton's interference with Congress, and consists of Counts Four, Five and Six. The offense level for this Group is 20, based on the highest offense level within this Group, which comes from Count Six.

Pursuant to USSG § 3D1.4, 1 unit is assigned for Group One, 1 unit is assigned for Group Two, and ½ unit is assigned for Group Three. A total of 2 ½ units results in an increase of three levels to the Group with the highest offense level, for a Combined Offense Level of 29. The Probation Office has calculated Mark to have a criminal history category of I, which is not disputed. Therefore, the guidelines range for Mark Middleton is 87-108 months of incarceration.

## Analysis for Each Count as to Jalise Middleton

<u>Count One:</u> 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Officer T.T.)

| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
|---|---|---|
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the relevant conduct here is assault, so we apply §2A2.2. <br><br> Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1. <br><br> Jalise Middleton's felonious assault on Officer Toran was "aggravated assault" because it was committed with the intent to commit another felony, namely, 18 U.S.C. § 231(a)(3) or 18 U.S.C. § 1512(c)(2). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.2(b)(3)(A) "If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury." <br><br> Officer T.T. testified that he experienced pain as a result of Jalise Middleton's strike to his face. The effect of this strike was made worse by the chemical agents in the air and their effect on his now scratched skin. |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." <br><br> Jalise Middleton admitted that she knew the persons she attacked were police officers and acting in that capacity. Officer T.T. was clearly identifiable as a police officer because he was wearing a full police uniform. |

| | | |
|---|---|---|
| | | Defendant's assaults were motivated by the fact that Officer T.T. was performing his duties as a police officer by protecting the Capitol from the mob of rioters, including the defendant. |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See discussion of Jalise Middleton's untruthful testimony, supra at 16-18.* |
| Total | 25 | |

Count Two: 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers (Officer R.C.)

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the relevant conduct here is assault, so we apply §2A2.2.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>Jalise Middleton's felonious assault on Officer R.C. was "aggravated assault" because it was committed with the intent to commit another felony, namely, 18 U.S.C. § 231(a)(3) or 18 U.S.C. § 1512(c)(2). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |

| | | |
|---|---|---|
| | | Jalise Middleton admitted that he knew the persons he attacked were police officers and acting in that capacity. Officer R.C. was clearly identifiable as a police officer because he was wearing a full police uniform and riot gear.<br><br>Defendant's assaults were motivated by the fact that Officer R.C. was performing his duties as a police officer by protecting the Capitol from the mob of rioters, including the defendant. Jalise Middleton's assault against Officer R.C. was further motivated by the fac that Officer R.C. was attempting to stop the defendants from assaulting Officer T.T., who was also defending the Capitol against the mob. |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See discussion of Jalise Middleton's untruthful testimony, supra at 16-18.* |
| Total | 22 | |

Count Three: 18 U.S.C. § 231(a)(3), Interfering with Law Enforcement Officials During a Civil Disorder (Officers T.T. and R.C.).

Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, we use "the most analogous guideline." U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. §2A2.4. |
| Cross-Reference: | | U.S.S.G. §2A2.4(c) – the relevant conduct here is assault, so we apply §2A2.2.<br><br>Section 2A2.2 defines "aggravated assault" as a "felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an |

| | | |
|---|---|---|
| | | intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>*See analysis of Count 1, above.* |
| Base Offense Level: | 14 | U.S.S.G. §2A2.2 |
| Adjustment | +3 | U.S.S.G. § 2A2.2(b)(3)(A) "If the victim sustained bodily injury, increase the offense level according to the seriousness of the injury."<br><br>*See analysis for Count 1 above.* |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>*See analysis for Count 1 above.* |
| Chapter 3 Adjustment | +2 | U.S.S.G. §3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."<br><br>*See discussion of Jalise Middleton's untruthful testimony, supra at 16-18.* |
| Total | 25 | |

<u>Count Four</u>: 18 U.S.C. § 1512(c)(2), 2 – Obstruction of an Official Proceeding

| | | |
|---|---|---|
| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." |

| | | *See discussion of Jalise Middleton's untruthful testimony, supra at 16-18.* |
|---|---|---|
| Total | 16 | |

<u>Count Five</u>: 18 U.S.C. § 1752(a)(1) – Entering and Remaining in a Restricted Building or Grounds

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See § 1B1.2 n.1. Here, the most applicable guideline is § 2B2.3.

| Base Offense Level: | 4 | §2B2.3(a) |
|---|---|---|
| Obstruction and Related Adjustments | +2 | §2B2.3(B)(1)(A): "If the trespass occurred … in furtherance of the administration of justice, national defense, or national security, increase by 2 levels"<br><br>As proven through evidence at trial, the Capitol grounds and building were restricted grounds on January 6, 2021. |
| Cross Reference | | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that felony offense, if the resulting offense level is greater than that determined above. |
| Base Offense Level (adjusted) | 14 (from Count 4) | U.S.S.G. §2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."<br><br>Jalise Middleton entered the restricted area of the Capitol complex for the purpose of obstructing the official proceeding—that is, stopping Congress from doing its work.  The substantive offense is thus Count Four, and the base offense level for that offense should be applied. |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive |

38

| | | conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." *See discussion of Jalise Middleton's untruthful testimony, supra at 16-18.* |
|---|---|---|
| Total | 16 | |

Count Six: 18 U.S.C. § 1752(a)(2) – Disorderly and Disruptive Conduct in a Restricted Building or Grounds

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers) and § 2B2.3 (Trespass). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. See §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4.

| Base Offense Level: | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If the offense involved physical contact." As the jury specifically found, Counts One and Two both involved physical contact with, respectively, Officers T.T. and R.C.. |
| Cross-reference | | Pursuant to U.S.S.G. §2A2.4, the Base Offense Level is 10. But U.S.S.G. §2A2.4(c) directs that the cross-reference in §2A2.2 applies "if the conduct constituted aggravated assault." "Aggravated assault," under n.1 to §2A2.2 "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury with that weapon; (B) serious bodily injury; or (D) an intent to commit another felony." |
| | 14 | U.S.S.G. § 2A2.2 |
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.2(b)(3)(A) Bodily Injury. *See analysis for Count 1 above.* |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of |

|  |  | conviction and any relevant conduct; or (B) a closely related offense." *See discussion of Jalise Middleton's untruthful testimony, supra at 16-18.* |
|---|---|---|
| Total | 24 | |

<u>Count Seven</u>: 18 U.S.C. § 1752(a)(4) – Engaging in Physical Violence in a Restricted Building or Grounds

| Base offense level | 14 | U.S.S.G. §2A2.4(a), cross-referenced to §2A2.2(a) Pursuant to U.S.S.G. § 2A2.4(c)(1), "[i]f the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." *See analysis for Count 1 above.* |
|---|---|---|
| Special Offense Characteristic | +3 | U.S.S.G. § 2A2.2(b)(3)(A) Bodily Injury. *See analysis for Count 1 above.* |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." *See analysis for Count 2 above.* |
| Chapter Three Adjustment | +2 | U.S.S.G. § 3C1.1: "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." *See discussion of Jalise Middleton's untruthful testimony, supra at 16-18.* |
| Total | 25 | |

<u>Count Eight</u>: 40 U.S.C. § 5104(e)(2)(D) – Disorderly Conduct in a Capitol Building

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

<u>Count Nine</u>: 40 U.S.C. § 5104(e)(2)(G) – Parading, Demonstrating, or Picketing in a Capitol Building

| Base Offense Level: | n/a | Because this offense is a Class B misdemeanor, the Guidelines do not apply. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9. |
|---|---|---|

<u>Criminal History Category & Grouping Analysis as to Jalise Middleton</u>

Jalise Middleton's offenses fall into three groups:

- Group One relates to the assault on Officer T.T., which is Jalise Middleton's most serious assault, and consists of Counts One and Seven. Count Three is also part of Group One because the assault on Officer Toran is conduct that is embodied in a specific offense characteristic applied to Count Three, specifically causing bodily injury.  The offense level for Group One is 25, based on the highest offense level within this Group, which comes from Counts One and Three.
- Group Two relates to the assault on Officer R.C. and consists of Count Two. The offense level for Group Two is 22.
- Group Three relates to Jalise Middleton's interference with Congress, and consists of Counts Four, Five and Six. The offense level for this Group is 20, based on the highest offense level within this Group, which comes from Count Six.

Pursuant to USSG § 3D1.4, 1 unit is assigned for Group One, 1 unit is assigned for Group Two, and ½ unit is assigned for Group Three. A total of 2 ½ units results in an increase of three levels to the Group with the highest offense level, for a Combined Offense Level of 28. The Probation Office has calculated Jalise Middleton's criminal history category to be I, which is not disputed. Therefore, her guidelines range is 78-97 months of incarceration.

<u>U.S.S.G. § 4C1.1 Does Not Apply</u>

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who

have no criminal history points and who meet certain additional criteria. Among those criteria is that the offense not involve violence. Mark and Jalise Middleton's assaults against police officers in the West Plaza both involved violence. Mark Middleton struck a police officer with a flag pole and Jalise Middleton struck another officer in the face with her hand, causing injury to his face. Both of them also physically grabbed hold of both officers and tried to pull them into the crowd and, in doing so, allowed other rioters to smash Officer T.T. in the head with a PVC pipe. The Middletons engaged in this course of action in the course of a deadly riot. Since their specific offense involved violence and was set within the context of a violent riot, § 4C1.1 does not apply.

V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, the Middletons' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The Middletons travelled to Washington after researching how to transport and possess weapons in the District of Columbia. On January 5 and 6, they saw the barriers marking the restricted area around the Capitol at least three times, photographed them, and then posted them to social media. Despite knowing that the area was restricted, they breached the secure perimeter and forced their way to the front of the crowd where they assaulted two police officers, with Jalise causing injury to one officer and Mark using a weapon on the other. After the fact, they boasted about their conduct extensively on social media.

Since their convictions, they have continued to express pride in their crimes, using the notoriety they have gained through this prosecution to establish a charitable organization, increase their public profile, capitalize on their crimes, and install themselves as unofficial leaders amongst those who peddle in conspiracy theories about January 6. The nature and circumstances of the Middletons offenses were of the utmost seriousness and their lack of remorse for those serious crimes both fully support the government's recommended sentence of 90 months of incarceration.

### B.  The History and Characteristics of the Defendants

Mark Middleton, a fifty-five-year-old man with a master's in theology, has no criminal record. M. Middleton PSR at ¶125. Jalise Middleton, a fifty-four-year-old woman with a high school diploma, also has no criminal record. J. Middleton PSR at ¶ 143, 150-152. The Middletons, despite never having run afoul of the law before, decided on January 6, 2021, to join a riot to accomplish their political ends. In furtherance of that end, they came to Washington prepared for violence. Their rhetoric surrounding their conduct at the Capitol contained repeated references to wars and culminated with Jalise's promise on January 5 that an "ass whoopin'" would be coming the next day. The Middletons made good on their rhetoric and assaulted police. These two otherwise law-abiding people rapidly resorted to violence to achieve their ends: stopping the certification of the 2020 election.

The Middleton's behavior at trial and since their convictions speaks volumes about who they are.  They each took the stand and perjured themselves repeatedly. Even when confronted with direct evidence that they were lying, they both repeated their lies. In telling these blatant lies, the Middletons demonstrated that they have no respect for the criminal process or the seriousness of these proceedings. They have since echoed these same lies in repeated media interviews.

Moreover, the Middletons conduct since January 6 shows that they do not have an iota of remorse or contrition for their conduct that day. To the contrary, they are proud of their crimes: starting when they took to Facebook to boast to their friends right after committing them on January 6 and continuing until today, the Middletons have trumpeted and celebrated their actions as patriotic, heroic, and honorable. They revel in their crimes and have used them to bring themselves notoriety and fame among those who propound alternative, dishonest narratives about January 6. With that fame, they have sought to fundraise and enrich themselves by capitalizing on their crimes, as discussed above and as will be discussed further below.

The Middletons were also less than truthful went they were interviewed by the Probation Office. First, they reported engaging in fundraising but only raising $600. M. Middleton PSR at ¶ 160; J. Middleton PSR at ¶ 163. They did not report a GiveSendGo account that is collecting donations for them and has received at least $1,300 to date.[9] They also entirely omitted from their interview with Probation any information about their other fundraising venture, which, between October and December 2023 alone, had a net revenue of $9,029.46, and raised approximately $113,399 in all of 2023.

In the time between their arrest and trial, the Middletons made more than ten public appearances, many of which were captured on video and published on the internet, in which they showcased the pride that they felt in having committed their times. Since their conviction, they have made at least four additional media appearances and, in each, have portrayed themselves as

---

[9] Unlike many GiveSendGo accounts set up by January 6 defendants, determining the precise amount raised by the Middletons is not easy because, rather than setting an objective of a lump sum which would display the amount of money they raised to date, the Middletons set a monthly goal, meaning that the total amount raised is not displayed. However, just by counting the public donations, as of May 2024, they have received at least $1,300 in donations from this website.

victims and sought to lionize their conduct on January 6. In these same interviews and appearances, they have slandered the officers who defended the Capitol and have blamed the officers they assaulted for what happened on January 6. As recently as April 2024, Mark Middleton was saying that everything he has gone through with this criminal case would be "absolutely worth it" if he is able to "save this nation," meaning accomplish his political ends. They have also started a screen-printing company which, according to their public descriptions, makes shirts that glorify those who committed crimes at the Capitol. They named this company "106 INK." While the defendants may have lived otherwise uneventful lives, the clear pride that they take in having committed these crimes weighs heavily in favor of a lengthy term of incarceration.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The Middletons' criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to these particular defendants also weighs heavily in favor of a lengthy term of incarceration. Jalise and Mark Middleton are not people who are easily deterred. Despite seeing at least four times the barricades that had been constructed around the Capitol, they breached the secure perimeter on January 6. They breached these barricades despite, by their own testimony, acknowledging that they sensed pepper spray in the air and could hear concussive crowd control devices going off. The Middletons knew that they were entering the scene of a riot, but they were determined to storm the Capitol and stop the certification and nothing short of physical force would deter them in this goal. Similarly, at the West Plaza police line, they ignored repeated commands to leave. Instead, Mark Middleton questioned why the police officers in the West Plaza were protecting the Capitol from the rioters, called those same officers traitors, and, after they resisted his first efforts to push through the barricades, yelled "Fuck you!" at them. After the assault, they both boasted of their crimes and the effect that their assaults and pushing: enabling other rioters to breach the police line and gain access to the Capitol where the vote to certify the 2020 Electoral College results had to be stopped.

While the Middletons' conduct on January 6, 2021, alone is sufficient to show that they are dearly in need of specific deterrence, their conduct since their arrest and particularly their conviction, is even more evidence of the quintessential need of specific deterrence here. The

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Middletons are extremely proud of what they did on January 6, 2021, and have said so repeatedly. They have laughed about their post-conviction conditions of release and see themselves as "martyrs." To this day, they use their social media accounts to trumpet dishonest and fanciful narratives about the riot at the Capitol to evade culpability and responsibility while at the same time having the audacity to claim that members of the Metropolitan Police Department and the Capitol Police were responsible for January 6. The opportunity for reform and reckoning is gone and this Court should sentence the Middletons in such a way that it specifically deters them from ever engaging in this behavior again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

48

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[12] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Taylor Johnatakis*, 21-cr-91 (RCL), the defendant, like the Middletons, expressed his intent to interfere in the certification on social media. Also like the Middletons, Johnatakis made his way to the front of the riot on the West Front, despite seeing signs that the police were being overrun. Like the Middletons, he pushed a bike rack barricade into police officers, but, unlike the Middletons, did so on the Upper West Terrace rather than in the West Plaza. Like the Middletons, Johnatakis grabbed an officer's arm such that he was unable to defend himself against further assaults. Like the Middletons, Johnatakis bragged about his conduct in the immediate aftermath of the assault in which he bragged, also like the Middletons, about how he was instrumental in pushing over bike rack barricades and opening up to the Capitol to additional

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

rioters. Also like the Middletons, Johnatakis expressed no remorse for his crimes, continued to refuse to accept responsibility for his actions, portrayed himself as the true victim of the events of January 6, and made repeated public statements in which he denied and minimized the conduct for which he had been convicted while casting aspersions upon the judicial process. Johnatakis' had a guidelines range of 70 to 87 months. Judge Lamberth sentenced Johnatakis to 87 months.

In *United States v. Thomas Smith*, 21-cr-599 (RBW), Smith presaged his conduct at the Capitol by making statements on social media indicating that he expected violence. Smith arrived at the Capitol to the scene of an unfolding riot, like the Middletons. Rather than turn away, Smith, like the Middletons, advanced into the riot and joined it. Because he arrived at the Capitol later than the Middletons, Smith was able to make it all the way up to the Lower and Upper West Terraces because the police line in the West Plaza had already fallen. Inside of the Lower West Terrace tunnel, Smith, like the Middletons, pushed against police officers who were trying to hold the line. Finding that he could not breach the line at this location, he moved to the Upper West Terrace where he again engaged with officers. Unlike the Middletons, Smith kicked a police officer during a skirmish but, like the Middletons, Smith then used a metal pole to strike an officer in the riot helmet. Smith testified at his trial and, also like the Middletons perjured himself repeatedly by testifying contrary to the objective video evidence and his own descriptions of his conduct from social media posts shortly after the fact. Smith refused to accept responsibility for his actions and never showed any remorse for his conduct. Smith's guidelines range was 108 to 135 months.[13] Judge Walton sentenced him to 108 months, the bottom of his guidelines range.

---

[13] The Probation Office calculated Smith's criminal history category as II, which, with a criminal offense level of 30, increased his guidelines range from 97 to 121 months.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v.*

*United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[14]

Because the defendants in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and their criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for their particular contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to

---

[14] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require both Mark and Jalise Middleton to each pay $2,000 in restitution for their convictions on all counts of the superseding indictment. This amount fairly reflects the Middletons' role in the offense and the damages resulting from their conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   FINE

The Middletons' convictions for violations of 18 U.S.C. §§ 1512(c)(2), 111(a)(1), and §231(a)(3) subject them to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it

53

makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

As mentioned above, the Middletons appear to have been less than forthcoming about their financial situation. As previously noted, they did not disclose to probation any information about their GiveSendGo account, which to date has raised at least $1,300. The Middletons also entirely omitted from their interview with Probation any information about their other fundraising venture, American Patriot Relief Fund, which had a net revenue of $9,029.46 between October and December 2023. *See* Attachment 2 at 3. According to their earnings reports for 2023, the Middletons', after travelling across the country soliciting donations,[15] earned approximately $113,400. *See id.* at 1. Therefore, the Middletons have not shown an inability to pay and pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $12,500 to $125,000 for Jalise Middleton and $15,000-$150,000 for Mark Middleton U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. The defendants have engaged in prodigious fundraising and have sought to profit off their status as criminal defendants and their subsequent convictions. They have done so under the pretense that their conduct on January 6 was "patriotic" and that they

---

[15] See, e.g., Kaufman County GOP Club, "Guest Speakers Mark & Jalise Middleton," available at https://rumble.com/v2ozmv8-guest-speakers-mark-and-jalise-middleton.html at 0:00-0:51 (Mark Middleton describes their travel to Miami and back to Texas with the American Patriot Relief Fund).

have been victimized and left indigent because of their crimes. The defendants were represented by two very able public defenders for their trial and for more than a year before that trial, and therefore have no legal fees associated with his case.  They should not be able to use their own notoriety gained in the commission of their crimes to capitalize on their participation in the riot.

## IV.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence each of them to 90 months of incarceration, three years of post-release supervision, $2,000 in restitution, and a fine.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

*s/ Brendan Ballou*
Brendan Ballou
DC Bar No. 241592
Special Counsel
United States Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 431-8493
brendan.ballou-kelley@usdoj.gov