## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 21-CR-367(RDM)** |
| **JALISE MIDDLETON,** | : | |
| | : | |
| **Defendant.** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM

I.      INTRODUCTION

Ms. Middleton  is not the demon the government makes her out to be. The

defense asks this Court to, for a moment, step outside the J6 scripted narrative of

the government and look at the FACTS of this case.[1]  J6 is a stain on our history,

and Ms. Middleton does not mean in any way to minimize the threat to democracy

that ensued that day. Yet Ms. Middleton, a person who is peaceful, hardworking

and concerned about America's future,  came to DC to protest peacefully what  she

and her husband believed to be a stolen election.  She had never been to a protest

before and had no idea what to expect. As this Court heard during this trial and

other trials, the protest turned into an unmanageable mob and riot.   Ms.  Middleton

---

[1] As this Court knows, undersigned counsel was appointed to represent Ms. Middleton in the bottom of the ninth inning. Because this Court presided over the trial in this case, and the jury returned a verdict of guilty, undersigned counsel will not narrate the evidence but rather point to the evidence that Ms. Middleton hopes will show this Court that she is a non-violent, well-meaning participant in J6.

has spoken about her remorse and holds herself accountable for her actions on

January 6, 2021, but not as portrayed by the government.

<u>OBJECTIONS TO THE PSR</u>

After carefully reviewing the PSR with Ms. Middleton, the defense filed

certain objections with the probation officer:

1. Paragraph 24:  a  clarification. Defendants were not holding each other to apply force to any barricade. Rather, as Ms. Middleton testified, they were holding each other in prayer.

2. Paragraph 25: clarification. Ms. Middleton objects to the assertion that Mr. Middleton tried to pull an officer over the barricade. She was there, and that is not what she observed. Rather, they were choking her and pulling her to them with her scarf.

3. Paragraph 26: factual clarification. Ms. Middleton never grabbed Officer Toran's arm. In fact, the video evidence shows otherwise.

4. Paragraph 35: factual clarification. The Middleton's did not stay for the entire speech but left early.

5. Paragraphs 40 & 41: factual clarification. The barricades began to bow about 8 feet down from where the Middleton's were standing.  The Middleton's did not throw themselves into the police line but rather were being held by two other rioters. They did not push against the barricades at all. There was contact with the barricades.

6. Paragraphs 44 , 46 & 47: factual clarification: Ms. Middleton was not trying to pull  Officer Toran over the barricade. It's physically impossible as he is a foot taller than Ms. Middleton.

7. Paragraph 57: objection: Ms. Middleton made no false statements while testifying. Her testimony lines up with the video evidence in the case as well as other testimony and videos from other J6 trials.

8. Paragraph 113: 4C1.1 should apply as Ms. Middleton did not use violence. She was engaging in self-defense.

9. Paragraph 135: Ms. Middleton will address a downward departure/variance based upon her medical conditions which are serious and cannot be adequately addressed in the BOP.

10. JSIN statistics here are inapposite. Does this include only J6 cases? And if so, were these cases sentenced before the DC Circuit's decision in *Brock* throwing out the 3 and 8 level enhancements?

Ms. Middleton  objected that she was not given 2 levels off under the first step act. *See* USSG §4C1.1(a)(7). She is a perfect candidate for the two point offense level reduction (zero point offender adjustment) recently promulgated by the U.S. Sentencing Commission under 4C1.1.[2] She objects

---

[2] The defendant must meet all of the following criteria to qualify for the 2-level reduction:

1. the defendant has not received any criminal history points;

2. the defendant has not received an adjustment for terrorism (covered by § 3A1.4);

3. the defendant did not use violence or credible threats of violence in connection with the offense;

4. the offense did not result in death or serious bodily injury;

5. the offense of conviction is not a sex offense;

6. the defendant did not personally cause substantial financial hardship (to be determined independently of the application of § 2B1.1(b)(c));

7. the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

8. the offense of conviction is not an offense involving individual rights (covered by § 2H1.1);

9. the defendant did not receive an adjustment under § 3A1.1 (hate crime motivation or vulnerable victim) or § 3A1.5 (serious human rights offense); and,

to not being given this two level lower adjustment under the guidelines. Her conduct did not involve violence nor the threat of violence, but rather her conduct in defending herself only began after she was assaulted herself by the police officer.[3] The Commission promulgated the zero-point offender provision in recognition of low recidivism rates of first time offenders and the Congressional directive "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious offense." [4] The Commission has identified crimes that are violent or otherwise serious and the conviction here does not fall under the exclusions. In other words, her conduct does not fall within one of the enumerated exclusions to application of this provision.  She  meets all of these criteria. *See* U.S.S. G. 5C1.1; 28 USC 994(j). In order for a crime to be violent in nature, courts have determined that to qualify as "using violence," one must "use physical force with the intent to injure[.] *United States v. Pineda-Duarte,* 933 F.3d 519, 523 (6th Cir 2019). And "credible threats of violence" require one to credibly "express an intention to inflict pain, harm, or punishment" through violence. *See United States v. Hernandez Barajas*, 71

---

10. the defendant did not receive an adjustment under § 3B1.1 (aggravating role) and was not engaged in a continuing criminal enterprise.

[3] Undersigned counsel believes the government did not disagree with the fact that she was assaulted first.
[4] Amendments to Sentencing Guidelines (April 27, 2023) at 78-80 *(citing* 28 U.S.C.Section 994(j)).

F.4th 1104, 1107 (8th Cir. 2023). The evidence here does not show that she used violence or a credible threat of violence toward anyone who was not hurting her or her husband and she did not have the intent to injure anyone. Her statement about an "ass whoopin" was not directed toward any one person in particular.

Other judges in this courthouse have applied this adjustment with conduct similar to hers. In *U.S. v. Yang*, No 23-CR-100(JDB), 2024 WL 519962 (D.D.C. Feb. 9, 2024)(granting 4C1.1 adjustment where defendant grabbed an officer's wrist during a scuffle and was part of a crowd that did not depart in the face of advancing police line). Judge Mehta also rejected the government's argument that just because an individual defendant who was part of a crowd that engaged in violence but who did not herself engage in violence is ineligible for the reductions. *See United States v. Parks*, 21-CR-411. There, the government argument that because the defendant was at the "front of a crowd rush" and was "aware of [violence]," that the adjustment did not apply. Judge Mehta reasoned that the defendant's conduct "did not result in death or serious bodily injury" and the defendant "did not use violence or credible threats of violence." [5]

As far as the obstruction the government complains about, they cannot prove this and this court should not give this enhancement. This enhancement only

---

[5] *See* Transcript of Sentencing, Tr. at 38.

applies upon a finding by clear and convincing evidence that defendant "gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of mistake or faulty memory." *United States v. Gaviria*, 116 F.3d 1498, 1518 (D.C. Cir. 1997) (per curiam) (*quoting United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). There is  no evidence that anything she testified about was a material matter with the willful intent to provide false testimony. Ironically, Ms. Middleton admitted to lying on Facebook.

Also, there is no injury to  police officer TT. What's interesting here is the omission of evidence of injury. As this Court most likely knows from previous trials, when a police officer is injured on duty, he or she is required to fill out an injury report and give it to the supervisor. Officers also have to file a use of force report when they use force against someone.[6]Here, we have neither. There is no evidence that Officer TT  ever missed a day of work after J6 due to his alleged injury allegedly caused by Ms. Middleton.  Clearly the government misunderstands the spirit of the guideline.

Pursuant to the United States Sentencing Guidelines (hereinafter "USSG"), Ms. Middleton believes that the following Guideline sections apply:

| | |
|---|---|
| USSG 2A2.2(a):  Base offense level. | 14 |
| USSG 4C1.1: no criminal history | -2 |
| ADJUSTED OFFENSE LEVEL | 12 |

---

[6] The Capitol Police Operational procedures requires them to file these reports.

Based upon these figures, and a criminal history category of I, Ms. Middleton's final guideline range is 10-16 months (Zone C).

For the reasons set forth herein, Ms. Middleton requests that this Honorable Court  impose a sentence within this guideline,  two years supervised release, 200 hours of community service and $2,000 restitution to account for:

1.  Her lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach her sincere remorse in this regard;

2.  Her amazing commitment to her community, her family and her church;

3.  Her long history of a strong work ethic which has allowed her to be a productive and positive member of society; and

4.  Her health conditions which qualify her as disabled.[7]

**A. <u>Background</u>**

Ms. Middleton is a wife, mother and grandmother. She graduated from  high school in 1988,  *See* PSR Paragraph 143.  When this Court considers  and compares the behavior of other J6 defendants, the Court will find that she chose to exercise her constitutional right to trial because she believes what she did on January 6, 2021 was what any concerned citizen would do. It is her sincere belief that she was attacked first and she to this day does not understand what she did to

---

[7] See Tr. 2/8/24, pps. 79-80. Medical records will be provided to the Court under seal by request.

provoke the anger of the officer that assaulted her.[8] Her pretrial behavior was stellar. She has not committed any infractions while on pretrial or posttrial release.

**B. <u>Reason for coming to DC</u>**

This Court can only understand why Ms. Middleton came from Texas to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021 and thereafter.   There is absolutely no evidence in this case to indicate that she had plans to enter the Capitol, to stop the vote,  or commit any violence that day.  She did not even know where the vote was taking place. During the testimony of the first witness, this point was illustrated by this Court:

> *MR. MCCAULEY: Yeah. So they never entered the*
>
> *building, we have conceded that. We are happy to concede that*
>
> *they did not approach -- this area is known as the upper west*
>
> *terrace -- that they did not approach the upper west terrace,*
>
> *that they never broke any windows, that they never used any*
>
> *objects to damage any property.*
>
> *But this is what they intended to have happen, and it*
>
> *did, in fact, happen. It is extremely probative evidence of*

---

[8] See Tr. 2/8/24 a.m., pps. 99=103.

*their conduct as to both their intent and the natural and*

*probable consequences of their actions.*

*THE COURT: I think the latter more than the former,*

*frankly.*

*MR. MCCAULEY: Yes*

Tr. p. 47., 2/6/24 am.

When this Court considers all of the factors before it, the Court must conclude that these are not the actions of someone there to overthrow the government or incite violence, but rather a concerned citizen who believed the election was stolen.

### C. **Ms. Middleton's remorse**

She believed that she should show her concern and support for an honest election by attending this rally scheduled for January 6, 2021, at the Ellipse on the Mall.   She is very upset that people died that day, that people destroyed certain areas of the Capitol, and that police officers were attacked by the crowd.   She actually only learned how horrible the day was  by watching the news reports that night and the days that followed,  just like the rest of us.  Her concern for all those

that died and were injured is sincere, and as she walked to the Capitol, she had no idea that the result would be what it was.[9]

### D. Her actions

By the time she made her way to the steps of the  lower west terrace of the west side of the Capitol,   Ms. Middleton often covered her face with her scarf.  No officers were outside in the courtyard at the time she walked up to the Capitol and the people were standing around waving flags and gathering on the grounds.

Ms. Middleton has absolutely no history of  political extremism.  She has never been in trouble with the law.  She had absolutely no expectation or knowledge of the consequences of others' actions that day, nor the consequences that their actions would have on her being present.  She was supporting everyday Americans' rights to assemble, to speak and to pray.

While she did not personally destroy anything, or commit violent acts, the jury found that she illegally played a part in a mob by engaging in civil disorder, assault, and  disruptive conduct.  According to Ed Maguire, a criminologist at Arizona State University, security forces are trained to ignore yelled insults and

---

[9] In determining sentencing consideration for remorse, the Courts and Guidelines consistently focus on the defendant's behavior <u>after</u> the initiation of the criminal  case, rather than prior to a defendant's  arrest. For example, under the U.S. Sentencing Guidelines (U.S.S.G.),  sentencing level reductions for acceptance of responsibility apply to a defendant's action in pleading guilty after the initiation of the case.  U.S.S. G. § 3E1.1.   Defendants are not given a more punitive sentence under the U.S.S.G.  if they do not indicate remorse prior to filing of the initial charges.  Evidence of remorse after initiation of criminal charges  is key.  This makes sense, as it allows time for the defendant to reflect on the evidence, and his own conduct.  This encourages reflection and review, and focuses on the defendant's actions after a defendant has availed herself of his constitutional right to counsel through the initiation of the prosecution of the case.

small acts of hostility, like pushes and thrown water bottles. And they receive training in absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators.  Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12, 2021), available at  https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html Clearly that is not what happened where Ms. Middleton found herself on the West lawn. On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." Id.

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." Id.  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." Id.

## II.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and

circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[10]

## III.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).    *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Ms. Middleton

---

[10] 1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
2.   The need for the sentence imposed;
3.    The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.    Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

Ms. Middleton was a follower, not a leader. She was not there to stop a vote or to interfere with anyone; that was never her intention. She simply went to DC to be a part of *the process*.  She understands that her decision to hit the officer back that hit her and was trying to pull her over the barricade was simply  instinctive conduct.  The officer was pulling her scarf and choking her and Ms. Middleton indiscriminately swatted at him to escape what she perceived was going to be her sudden death. She understands that her decision to be a follower, and her fear of the officers that hit her, led her to participate in the event that she was powerless to control, not only because of her size, but because of others pushing her from behind.[11]  She only communicated with her husband. This is not an excuse for why she hit back. It's simply an explanation of the facts.

### i.  Punishment for conduct of others

Despite this acknowledgement of her own role in making these  decisions, she should not be punished for fighting back after being attacked nor for decisions and/or violence perpetrated by other people, especially those with a clear intent and plan to attempt to injure or overrun the Capitol Police and MPD officers that day.

---

[11] Undersigned counsel is disturbed that the photographs the government cites in their sentence memo shows other rioters right next to Ms. Middleton observing the conduct of these police officers yet the government has never, to this day, identified the man in the hoodie or the man in the goggles. Undersigned counsel understands that these requests were made of the AUSA's who declined to identify them. One person that was right next to the Middletons however has been identified as Justin McCallister. His lawyer is Peter Cooper, who promised to return undersigned counsel's call but has not done so after repeated attempts by undersigned counsel. McCallister was charged and is pleading guilty. He has information that could be very helpful to Ms. Middleton yet  she has been stymied by all fronts. The goverement AUSA's say they were not asked to identify these individuals when asked by undersigned counsel, and when asked to identify them, stated that "we have no further information to disclose at this time."

She did not engage in any other violence at any point on January 6th, which is quite telling for her behavior at the barricade.  Her behavior only happened because she was assaulted FIRST-hit by a police officer and pushed by a large violent protestor behind her. *See* USA Sent. Memo, p. 10, figure 9.   This explanation is consistent with her testimony at trial. And as soon as she was pepper sprayed, she left the area. That action tells the Court  that  she did not intend to harm any officers as her intent was to survive the chaos herself.

Additionally, there is no evidence that her intent was to get into the Capitol. She was on the West lawn for a total of approximately 30 minutes or so.

Unlike many others in the crowd, she did not shout for reinforcements, throw objects at the police line or bully or force others into participating in the chaos.   She also did not steal or damage property that day.  She wore normal clothing. She stood there observing and praying.  She was now part of a crowd that turned violent.  We now know, that by their mere presence, the crowd overwhelmed the police.   But it should be considered that while others did in fact fight with police and ram their bodies into the barricade, Ms. Middleton did not.

Ultimately, a better path would have been to leave the grounds altogether once she saw what was going on out in the crowd. At points in the day, especially earlier on the West Lawn, Ms. Middleton did not have a clear understanding of what was occurring.  The crowd had women and children in it and she saw

14

munitions being fired at peaceful people and  had a hard time processing the event as clearly unsafe or illegal.  Indeed, all she could see from his vantage point was a crowd being shelled by police and gassed.  The people close to her were standing around and reacting with astonishment and anger over the perceived abuse of force by the Capitol Police.



*Figure 1*

It should be noted that in 2020 - 2021 the media promoted and encouraged the notion that bad behavior by law enforcement was to be witnessed, documented and revealed– Geroge Floyd's tragic murder by police was only discovered because someone videotaped it and we all saw the truth.   Ms. Middleton was unsure, but believed she was potentially witnessing something similar – so she stayed to see how things unfolded – and she takes responsibility for that choice.

Hindsight makes the best decision seem so obvious, but in real time, you don't always make the best decision because the best decision is not readily apparent until it's all said and done. Furthermore, just because Ms. Middleton did not make the best decision, does not mean that she made the wrong decision intentionally. The evidence shows she was not actively participating in violence and was assaulted by not one but two other officers.  In the chaos of that day  she herself fell victim to her own fears and the bad decisions of others and in hindsight wishes she had not made it all the way to the police barricade and remained there.

Remarkably, since her conviction,  she has endeavored to help other J6 defendants by raising funds and  serving them in any way necessary to help them to survive.  She runs a support hotline, assists with commissary, ministers to family members and to J6 defendants as well.  What's critically missing from the evidence in this case is that she never says or texts or emails anyone that says she was there to stop the vote, knew a vote was taking place and where the vote was, or that she ever contemplated obstruction of the Electoral College Certification. She would never in a million years intentionally try to harm a police officer.

By the time she arrived at the U.S. Capitol, the barriers that had been erected along the perimeter of the building were no longer present. This was shown at trial. She met no resistance in her walk up to the Capitol. At the time,  she didn't dream she'd be charged for protesting.

Yet here she is, a non-violent, hard-working American - someone the government will argue before this Court should go to federal prison for many years without taking into consideration the fact that she herself was assaulted first. The rank unfairness of this is illustrated by a recent political case in this courthouse. For example, in *USA v. Kevin Clinesmith*, 20-CR-165 (JEB),[12]  a lawyer who worked for the FBI  lied on applications for FISA warrants for political reasons, and was not sentenced to prison-he got probation. Mr. Clinesmith walked out of federal courtroom in this courthouse a free man without spending a day in prison. That's a disparity the size of Texas. That's not to suggest that this honorable Court should therefore give Ms. Middlteon a sentence of probation. No, no, no. What it says is that she should be punished for her conduct when taking into account all the facts of her particular conduct and no one else's. *See* Disparity*, infra.*

As the many letters of support indicate, she is hardworking, kind, generous and law abiding. She volunteers much of her time to causes such as meals on wheels,[13] and various church committees. She helps care for her widowed sister in law. She serves as a board member of American Patriot Relief. *See* letter,  Exhibit

---

[12] Our system of law needs to address this anger which our legal system is not really set up to address. The only people upset about the FBI lawyer getting probation were other lawyers. But when J6 defendants are sentenced it seems the whole world is upset.

[13] Ms. Middleton started this long before being charged in this case and drives to two different counties.

1. She will continue to do these things after she is sentenced assuming she is physically able to do so.

The government must concede that she committed no violent acts and destroyed no property, even though she was in the proximity of others committing violence. She did not suit up for combat.  She did not obscure her face. She was not armed.

This has obviously been a tough road for Ms. Middleton and her family.   She has a very simple life: she worked hard and tries at every turn to improve herself, manage her medical issues, support her family, and be a servant of God.  It is of utmost importance to her that this Court and fellow citizens understand that she is incredibly saddened and remorseful about what took place on January 6, 2021.  (Ms. Middleton's letter to the Court will be filed separately). People died, and law enforcement officers and protesters suffered multiple injuries. Ms. Middleton does give speeches and has appeared on podcasts about January 6, and every time she does, she mentions the death of Brian Sicknick.  She tries to give both sides of the story. It's important to her that people realize the great suffering caused that day and that the consequences are in some cases irreversible. None of her actions will be erased from the internet. It's there forever. She has been the subject of a number of media accounts lumping her in with others that were violent, ruthless and well-orchestrated that were there on January 6, 2021 for violent purposes. Her personal

character and reputation will forever be tarnished. She can't vote or carry a gun, which in Texas, is like having your arm cut off.   In typical FBI fashion, when her home was searched pursuant to a search warrant, they took her wedding ring and took it with them.[14]   Wouldn't a photograph of it suffice? Apparently not.  She has been on home confinement and missed funerals, births, and other significant life events. In sum, society has already punished her for her actions and will continue to do so. It doesn't take a long prison sentence for one to feel remorse or learn a better lesson from their mistakes.

In determining what punishment is warranted, this Court should not lose sight of the fact that she intended no harm, and has lived a life with no criminal conduct. She has been a model of good behavior on pretrial and post-trial release. Her past behavior and her post arrest behavior show that she is a very productive citizen and the Court can rely on that as a basis to sentence  her  to a term of imprisonment under the guidelines (if the Court accepts the enhancements) and a term of supervised release of two years considering the 3553 factors.   The six level enhancement should not apply because she didn't hit the officer because he was an officer and she did it in self defense. If the Court does apply the enhancement, a variance downward would still be appropriate due to these factors.

## B. Need for the Sentence imposed

---

[14] See Tr. 2/8/24 a.m., p. 109. They still have her ring.

1. **General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  She has already been severely punished as noted *supra.*  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A sentence within the guidelines of 10-16 months,  restitution and supervised release does constitute  a real punishment  and  it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms while on supervised release. She has been on pretrial release for nearly two years  with many restrictions and has complied with them completely.    The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison

sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

2. **Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant**

Her likelihood of recidivism is really non-existent. She has expressed genuine remorse and contrition. Her acceptance of responsibility was swift, complete and without reservation and exercising one's constitutional right to go to trial should not be used against her. A felony conviction will change her life forever. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at

http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given her  current age,  the fact that she's married, and no criminal history and other issues consistent with what is mentioned above, the likelihood that she would ever re-offend is as close to zero as one might come.[15] A punishment within the  enhanced guidelines in this case is going to have the exact opposite effect than what is in the interest of justice.  Ms. Middleton urges the Court to impose a sentence below the guidelines .

### 3.  Just Punishment

Mrs. Middleton now has a felony conviction which, in and of itself, is quite punitive.  The conviction  affects possible future job opportunities and will

---

[15] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

remain with her for the rest of his life.  She can't vote, serve on a jury or carry a gun. But supervised release will allow her to continue to work and support her community and continue the volunteering she does in her church and in her community.  If incarcerated for a long period of time, there will be only more suffering. Ms. Middleton has already suffered a heart attack at the age of 52 soon after she was arrested and imprisoned in this case. Her grandmother, mother and brother both died of heart attacks. Her mother died at 62 and Ms. Middleton's brother at 36.

Given sentences imposed in comparative cases, a sentence  below the guidelines, which is recommended by the probation office,  is not unusual and is  appropriate here. *See* Disparity, *infra*.

And after one serves their time, there is supervised release to follow. This involves significant restraints on a defendant's liberty.  Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's rules of the road.  *Jones v. Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives.  *Ibid.*  Not only must they faithfully obey these restrictions and conditions, but they also live in constant

fear that a single deviation, however slight, might result in being sent to prison again.  *Ibid*.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation.  *Ibid*.  They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime.  *Ibid*. [Supervised release] significantly restrains defendants' liberty to do the things that free people in this country are entitled to do.  *Ibid*.

### C. The kinds of sentences available

A  guidelines sentence would result in sentencing disparity with other individuals who behaved similarly but were not similarly charged . *See infra*.

Imposition of a fine is discretionary, and, defendant respectfully submits, she cannot pay a fine in this case.

### D. **The need to avoid unwarranted sentence disparities**

If this Court were to impose a sentence greater than the guideline range, supervised release, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing  or are pending in this Court.[16]  Paragraph 151 of the PSR states that

---

[16] For example, *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6 defendant pushed police officers and made contact with them yet the government chose not to pursue those charges and he was given 3 months incarceration and

---

allowed to keep his class B misdemeanor deal. Here's what he posted: "was there for over a half hour. I got gassed several times inside, many times outside the Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group unaffiliated with the government brought to their attention additional violent conduct by Mr. Reeder, and the government asked to continue the sentencing hearing. Ultimately, despite concrete evidence of violence, the government chose not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages 30-41. Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.*, ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold": Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.*, p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.*, p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. Id., p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months' incarceration. *Id.*, p. 2. The Court imposed a sentence of six months' incarceration with credit for time served, followed by 24 months of supervised release.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant jabbed him with a lacrosse stick. Id. A search incident to arrest recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.

the median length of imprisonment of J6 defendants whose primary guideline was 2A2.4,  is 41  months. As this Court knows, each case must stand on its own facts.

Ms. Middleton's  culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers (without first being assaulted) on that date.  The officers she came in contact with did not get hurt. These cases demonstrate that the sentence requested by the government is greater than necessary. Comparing Ms. Middleton's behavior to the panoply of January 6 defendants, her conduct was  less serious than those who brought weapons with them and caused injury to officers.

## V. CONCLUSION

We are not asking that this Court let Ms. Middleton off the hook. She respectfully moves this court to impose a sentence slightly below the guidelines, 24 month's supervised release, 200 hours of community service,  and $2,000 restitution.  This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Ms. Middleton as an individual and account for her unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v.*

*United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,


By:     /s/   *Kira A. West*
Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com


CERTIFICATE OF SERVICE

I hereby certify on the 15th day of October, 2024 a copy of same was delivered to the parties of record pursuant to the  rules of the Clerk of Court.
*Kira West*             /S/
Kira Anne West